Gerald E. HESSEL and Leatrice A. Hessel, Plaintiffs–Appellants,

v.

Patrick O'HEARN, et al., Defendants–Appellees.

No. 91–3469.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1992.

Decided Oct. 6, 1992.

William Gergen (argued), Gergen & Gergen, Beaver Dam, Wis., for plaintiffs-appellants.

Timothy J. Strattner (argued), James M. Fergal, Schellinger & Doyle, Brookfield, Wis., for defendants-appellees.

Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

The Hessels bring this suit for damages under 42 U.S.C. § 1983 against 14 Wisconsin police officers who participated in a search of their premises for evidence of illegal gambling. The district judge granted summary judgment for the defendants.

The plaintiffs claim that the officers exceeded the scope of the search warrant, in violation of the principles of the Fourth Amendment, and also stole items of personal property—three cans of soda pop, an antique chest containing a small camera, and an envelope containing $600 in cash. The judge held that the officers had not exceeded the scope of the warrant, that the plaintiffs had failed to connect the theft of the chest with any of the defendants, and that the theft of the cans of soda pop was rendered nonactionable by the venerable legal maxim *de minimis non curat lex*. (The lawyers on both sides of this case, no Latin grammarians they, call it the *"de minimus"* doctrine.)

Rightly suspecting that the plaintiffs were operating an illegal gambling business out of their Lone Mallard Inn, a passel of police officers descended upon the inn armed with a search warrant authorizing them to seize illegal lottery tickets (that is, tickets for any lottery other than the state's own), "money which [*sic*] is the fruit or has been used in the commission of a crime," and "documents that may constitute evidence of a crime." The police conducted a thorough search and seized not only a large number of illegal lottery tickets, money clearly obtained from the sale of other of these tickets, and business records likely to contain evidence of transactions in such tickets, but also legal lottery tickets, an adding machine, the cover of a telephone book, and a number of glasses, jars, and other containers that held small sums of money, together with the monies themselves. For example, next to the hot dog machine was a dish containing $6.20, which was money that customers had placed in the dish to pay for hot dogs. When Mr. Hessel went to the police station the next day to be booked, the police, their haul having been sifted by the district attorney, gave him back everything that had been seized except the illegal lottery tickets themselves, the money clearly obtained from the sale of those tickets rather than from the lawful activities of the inn, and a few business records. Charged with a felony violation of Wisconsin's gambling laws, which insist that gambling is a state monopoly, Mr. Hessel was permitted to plead guilty to a misdemeanor violation and was sentenced to a term of probation and of public speaking on the evils of gambling. An odd sentence: his crime was not promoting gambling, but invading the state's monopoly of gambling. But that is none of our business.

■ The Hessels' challenge to the seizure of items arguably beyond the scope of the search warrant may seem academic. This is a damages suit. The items in question were returned the day after they were seized. What harm can have been done? Well, there may have been harm, and of two sorts. First, while the loss of the use of their money for a day was trivial, the time spent to get the money and other items back represented a real cost, and there is no minimum amount of controversy in federal civil rights cases, as the Supreme Court went out of its way to note in *Parratt v. Taylor*, 451 U.S. 527, 529, 101 S.Ct. 1908, 1909, 68 L.Ed.2d 420 (1981). Second, although general or, as they are sometimes called, "presumed" damages—compensatory damages awarded without proof of injury—are not recoverable in a constitutional tort suit when the only infringement of constitutional rights is a denial of due process in the sense of a right to notice and a hearing, *Carey v. Piphus*, 435 U.S. 247, 262–64, 98 S.Ct. 1042, 1051–52, 55 L.Ed.2d 252 (1978); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), they may be recoverable when substantive constitutional rights, such as the right to freedom of speech, or the right to be free from unreasonable searches and seizures, are infringed. *Memphis Community School District v. Stachura*, 477 U.S. 299, 310–11, 106 S.Ct. 2537, 2544–45, 91 L.Ed.2d 249

(1986); *Gilpin v. American Federation of State, County & Municipal Employees,* 875 F.2d 1310, 1314 (7th Cir.1989); *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1559 (7th Cir.1986). So if your right to a hearing is taken away but you wouldn't have won your case had you had a hearing, you must, to get more than the nominal damages to which any violation of constitutional rights entitles a prevailing plaintiff, *Memphis Community School District v. Stachura, supra,* 477 U.S. at 308 n. 11, 106 S.Ct. at 2543 n. 11; *Carey v. Piphus, supra,* 435 U.S. at 266, 98 S.Ct. at 1053; *O'Connor v. City & County of Denver,* 894 F.2d 1210, 1215 (10th Cir.1990); *Lewis v. Woods,* 848 F.2d 649, 651 (5th Cir.1988); *Davis v. Village Park II Realty Co.,* 578 F.2d 461, 463 (2d Cir.1978), prove some emotional harm or other specific injury from the deprivation. But if your home is illegally invaded or you are illegally prevented from voting or speaking you can seek substantial compensatory damages without laying any proof of injury before the jury, provided that you do not ask for heavy damages on the ground that the constitutional right invaded was "important." *Memphis Community School District v. Stachura, supra.*

■ But all this is an aside, because we agree with the district judge that the defendants did not violate the plaintiffs' rights by seizing the items that the plaintiffs contend were beyond the scope of the warrant. The defendants were entitled to rely on the warrant, *Patton v. Przybylski,* 822 F.2d 697, 699 (7th Cir.1987); *Hill v. McIntyre,* 884 F.2d 271, 277 (6th Cir.1989), which means they were required to interpret it. They were not obliged to interpret it narrowly, and they would have been mistaken to do so, because items not in fact necessary for proceedings against the owner can always be returned whereas items not seized are unlikely to be found the next time the police go looking for them. *United States v. Blakeney,* 942 F.2d 1001, 1028 (6th Cir.1991). The prosecutor is in a better position to winnow the wheat from the chaff than the police are, cf. *Andresen v. Maryland,* 427 U.S. 463, 479–82, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976), and

he cannot do this if the police interpret the warrant narrowly. *United States v. Lucas,* 932 F.2d 1210, 1215–16 (8th Cir.1991).

It is true that the "plain view" doctrine introduces some play into the joints. It allows officers executing a valid search warrant to seize contraband or incriminating evidence that they see in the course of their search even though the items in question were not named in the warrant. *United States v. Jefferson,* 714 F.2d 689, 694 (7th Cir.1983). So the warrant is not quite the straitjacket it would otherwise be. But the doctrine leaves unsolved the problem of items seen during the search but not incriminating on their face, and items that are not seen but that a more extensive search would bring to light. Both sorts of item may evade seizure if, though within the compass of the warrant if flexibly interpreted, they are not within it if the warrant is narrowly interpreted.

We should not like to be understood as suggesting that a search warrant gives the executing officers a blank check. There are limits to interpretation. Otherwise the constitutional requirement that a search warrant describe with particularity the things to be seized would be a nullity. Cf. *United States v. Jenkins,* 901 F.2d 1075, 1081 (11th Cir.1990). Flagrant disregard for the terms of the warrant transforms it into a general warrant, which the Fourth Amendment forbids. *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir.1988). We do not have a case of flagrant disregard. Reasonably construed, the warrant in this case covers all the items seized, even though some of them turned out to be irrelevant to the investigation and were returned.

So we turn to the alleged theft of the soda pop. One, of the defendants, Officer Soblewski, admitted in disciplinary proceedings arising out of the search that he had drunk a can of the Hessels' soda pop. We take this to be an admission that he stole it. The only alternative we can think of is that he got it as a bribe. He does not ask us to consider that possibility. The value of the soda pop was under a dollar—*de minimis,* the defendants argue. They admit that

there is no minimum amount in controversy in federal civil rights cases, or for that matter in other federal-question cases, with trivial exceptions, but remind us that in *Bart v. Telford,* 677 F.2d 622 (7th Cir. 1982), we said that "even in the field of constitutional torts *de minimis non curat lex.*" *Id.* at 625. *Bart* does not stand alone. See *Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975); *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977); *Hudson v. McMillian,* — U.S. —, —, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *Lee v. Weisman,* — U.S. —, —, 112 S.Ct. 2649, 2678, 120 L.Ed.2d 467 (1992) (concurring opinion); *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir.1988); *Jones v. Reagan,* 696 F.2d 551, 555 (7th Cir.1983); *Crawford–El v. Britton,* 951 F.2d 1314, 1322 (D.C.Cir.1991); *Mann v. Smith,* 796 F.2d 79, 85 (5th Cir.1986); *Boals v. Gray,* 775 F.2d 686, 689 n. 5 (6th Cir.1985); *Carter v. Western Reserve Psychiatric Habilitation Center,* 767 F.2d 270, 272 n. 1 (6th Cir.1985) (per curiam); *Walsh v. Louisiana High School Athletic Ass'n,* 616 F.2d 152, 158 (5th Cir.1980); *Collinson v. Gott,* 895 F.2d 994, 1006 (4th Cir.1990) (dissenting opinion).

Can these dicta (and that's what they are, except *Carter,* which, as we shall see, is probably not good law even in the Sixth Circuit) coexist with the absence of a minimum amount in controversy requirement? We think so. A small definite loss is different from a small indefinite one. The law does not excuse crimes or torts merely because the harm inflicted is small. You are not privileged to kill a person because he has only one minute to live, or to steal a penny from a Rockefeller. The size of the loss is relevant sometimes to jurisdiction, often to punishment, and always to damages, but rarely if ever to the existence of a legal wrong. It would be a strange doctrine that theft is permissible so long as the amount taken is small—that police who conduct searches can with impunity steal, say, $10 of the owner's property, but not more. We would no longer talk of theft in such a case, but call it a new species of eminent domain, or a step toward the priva-

tization of police services. The leading work of scholarship on the *de minimis* doctrine quotes an old case which said, we think correctly, that "this maxim is never applied to the positive and wrongful invasion of another's property." Max L. Veech & Charles R. Moon, "De Minimis Non Curat Lex," 45 *Mich.L.Rev.* 537, 550 (1947).

■ And yet despite all this, if a loss is not only small but also indefinite, so that substantial resources would have to be devoted to determining whether there was any loss at all, courts will invoke the *de minimis* doctrine and dismiss the case, even if it is a constitutional case. The costs of such litigation overwhelm the benefits. *Prosser v. Elections Board,* 793 F.Supp. 859, 865 (W.D.Wis.1992) (three-judge court) (per curiam), instanced "trivial differences in population equality between" two reapportionment plans: "the dilution in any voter's electoral power resulting from a 1 percent difference in number of voters would be too trivial to register in the most sensitive analysis of political power," and would accordingly be disregarded in the court's appraisal of the plans. *Williams v. Boles* gave the example of a guard's curling his lip at a prisoner. Cf. *Mann v. Smith, supra,* 796 F.2d at 85. This might be a comparable case if Office Soblewski had merely breathed on the can of soda pop, and the Hessels had been reluctant to drink from it afterward. The maxim's "design is to prevent expensive and mischievous litigation, which can result in no real benefit to complainant, but which may occasion delay and injury to other suitors." *Schlichtman v. New Jersey Highway Authority,* 243 N.J.Super. 464, 472, 579 A.2d 1275, 1279 (1990), quoting *Swedesborough Church v. Shivers,* 16 N.J.Eq. 453 (Ch. 1863). See also *Manchester Mills v. Manchester,* 58 N.H. 38, 39 (1876). It has little or no proper application to cases in which the monetary cost of the loss is, though tiny, readily determinable. The right to maintain a suit to recover the loss depends in such a case only on the jurisdictional minimum amount in controversy, here zero. We think the court meant no more than this when it said in *Lewis v. Woods, supra,*

848 F.2d at 651, "A violation of constitutional rights is never *de minimis.*" For that was a case in which the district judge had affixed the fatal label to a theft of a radio and amplifier that the plaintiff had bought for $76.90. In the parallel area of taking property for a public use, the owner is entitled to compensation regardless of how little property is taken. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

The maxim *de minimis non curat lex* is often, perhaps typically, used in a broader sense, to denote types of harm, often but not always trivial, for which the courts do not think a legal remedy should be provided. As Veech and Moon point out, the doctrine is closely related to meliorative doctrines such as substantial performance, designed to smooth the sharp edges of technical rules; such doctrines, however, have little if any application to deliberate wrongs. This version of the *de minimis* doctrine has been important in constitutional cases in which the issue was whether the plaintiff had been deprived of "liberty" within the meaning of the due process clause. Is it an invasion of a student's liberty for a public school to refuse to correct an erroneous grade? *Raymon v. Alvord Independent School District,* 639 F.2d 257 (5th Cir.1981) (an opinion, by the way, written by the author of *Lewis v. Woods*). Of a taxpayer's liberty, if the Internal Revenue Service displays a lack of courtesy, accuracy, and restraint in the processing of his tax return? *Cameron v. Internal Revenue Service,* 773 F.2d 126, 129 (7th Cir.1985). Does a bride have a right founded in the constitutional notion of liberty to wear slacks to her city-hall marriage? *Rappaport v. Katz,* 380 F.Supp. 808 (S.D.N.Y.1974). If a public employer breaks its promise to give its employees fresh Danish pastry during their coffee breaks, is this a deprivation of constitutional liberty or property? *Brown v. Brienen,* 722 F.2d 360, 364–65 (7th Cir. 1983). The point, at least the main point, is not that the harms in these cases are small but that there is no actionable wrong. Cf. *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

■ There can be cases like that in the property area as well—in fact, it was with reference to deprivations of property that the Supreme Court mentioned the *de minimis* doctrine in the *Goss* case. If Soblewski had merely touched the can of soda pop, that would be a "deprivation" so remote from the concerns of the Fourth and Fifth Amendments as to count as no deprivation at all. But there is no doubt that taking a person's property is wrongful, as merely touching it without the owner's consent may not be. The *de minimis* doctrine is not intended for definite losses, however small, inflicted by definite wrongs. *Carter v. Western Reserve Psychiatric Habilitation Center, supra,* in holding that a two-day suspension without pay of a public employee was *de minimis,* fits neither bin of the doctrine as we understand it (small indefinite loss, or no actionable wrong), and we are not surprised that it was distinguished to death by the same court in *Boals v. Gray, supra,* within four months.

■ We do not suggest that amount of harm and amount of wrong are completely unrelated. People care more about big harms than little ones, and so are more likely to regard the former as wrongful. If Soblewski had helped himself to a glass of (metered) tap water, a question would be presented whether he had committed a wrong of which constitutional law should take notice. Even when water is metered, people treat small quantities of it as if they were free, which may entitle even a stranger to "help himself" to a glass of it. They do not treat cans of soda pop with the same insouciance.

■ The last issue concerns the proof of individual defendants' liability. We know who took one can of soda pop. We do not know who took the other two cans, the antique chest with the camera inside, or the envelope with its $600 inside. For that matter we do not know whether there really was an antique chest, a camera, or an envelope with $600, because the plaintiffs

inexplicably waited five months before complaining that these items had been left off the inventory that the police had prepared of the items seized in the search. But that issue cannot be resolved on summary judgment.

We may assume that the stolen items, however many there were, were taken by one of the 14 defendants. That is not good enough to fend off summary judgment. The plaintiffs allege no conspiracy. And there is no doctrine of superiors' liability to which they might appeal, *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988), such as might allow imputing the liability of the rank and file to the higher ups. There isn't even a doctrine of respondeat superior in constitutional tort cases, and anyway the agencies that employed the defendants are not themselves named as defendants. And the plaintiffs do not attempt to invoke the principle of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), and *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), that persons who commit a negligent act or sell a defective product may be liable to a victim of one of their number even if the victim cannot prove which of the defendants caused his harm. That leaves the pure principle of collective punishment as the sole possible basis of liability in this case. Happily that principle is not—not generally, anyway—a part of our law. (But see *Ustrak v. Fairman*, 781 F.2d 573, 575 (7th Cir.1986); *Hamilton v. O'Leary*, 976 F.2d 341, 347–48 (7th Cir.1992) (dissenting opinion).) Proximity to a wrongdoer does not authorize punishment. Those officers who participated in the search but did not steal any of the Hessels' property are innocent in a way in which the defendants in *Summers* and *Sindell* were not—for all of those defendants had done a harmful, a dangerous, thing, albeit not all had harmed the particular plaintiff. There is no more reason to fix liability on these 14 police officers than on the entire population of Horicon, Wisconsin, the site of the Lone Mallard Inn.

Well, maybe a little more reason. The plaintiffs are in a bind. Each of the defendants can plausibly deny guilt. A jury may find it impossible to determine who is lying. But that is just to say that some cases are more difficult to prove than others. The controversial decision of *Ybarra v. Spangard*, 25 Cal.2d 486, 154 P.2d 687 (1944), held that the doctrine of res ipsa loquitur could be used to thwart a "conspiracy of silence" of medical personnel who refused to disclose which of their number had injured the plaintiff, who went into the hospital for an appendectomy and emerged with a serious injury to his shoulder and neck. Whether any such approach (so redolent of collective punishment) might have been used by the plaintiffs in this case we need not decide; they have not urged it. All they argue to us is that they should be permitted more discovery. They hope that maybe they can elicit damaging admissions from some of the defendants or trace the stolen items. Their hope may be well founded, but they should have made the argument to the district court when the defendants moved for summary judgment. Fed.R.Civ.P. 56(f) authorizes the district court to hold off acting on a motion for summary judgment until the opponent can conduct more discovery. The plaintiffs did not ask for more time for discovery. It is now too late.

The decision of the district court is therefore affirmed except with respect to Officer Soblewski's theft of the can of soda pop.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

COFFEY, Circuit Judge, concurring.

I concur in the majority's decision upholding the defendant police officers' seizure of the plaintiffs' illegal lottery tickets and other items associated with the sale of lottery tickets as within the scope of the search warrant. I am forced to write separately to express my disagreement with the majority's attempt to unnecessarily expand the plain view doctrine, thus permitting police officers to seize items not authorized in the warrant or items which are beyond the legal parameters of the recognized plain view exception to the Fourth Amend-

ment warrant requirement. The majority states *that the officer can exercise his or her own discretion when executing the warrant and seize items not authorized in the warrant or items not incriminating on their face* "*because items not in fact necessary for proceedings against the owner can always be returned whereas items not seized are unlikely to be found the next time the police go looking for them.*" Maj.Op. at 302 (citing *United States v. Blakeney,* 942 F.2d 1001, 1028 (6th Cir.1991)). I respectfully disagree, and emphasize that it is the magistrate who is authorized under present case law to exercise discretion in the issuance of the warrant and "nothing is left to the discretion of the officer executing the warrant." *Horton v. California,* 496 U.S. 128, 144, 110 S.Ct. 2301, 2312, 110 L.Ed.2d 112 (1990) (quoting *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927)); *see also Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *United States v. Shoffner,* 826 F.2d 619, 630–31 (7th Cir.1987) (the warrant should describe with reasonable specificity the categories of items to be seized, so that officers are not called upon to exercise discretion when executing the warrant); *United States v. Somers,* 950 F.2d 1279, 1285 (7th Cir.1991) (search warrant should describe the objects of the search with reasonable specificity and need not be elaborately detailed).[1]

After holding that the "defendants were entitled to rely on the warrant," the majority utilizes the *Blakeney* decision to conclude that law enforcement officers "were not obliged to interpret [the warrant] narrowly, and it would have been a mistake for them to do so ..." because irrelevant items or "items not in fact necessary for proceedings against the owner can always

be returned...." Maj.Op. at 302. The majority's use of the *Blakeney* decision to permit police officers to exercise discretion when invoking the plain view doctrine is inappropriate because *Blakeney* is a case limited to its unique set of facts and should not apply to the search warrant executed in Hessels' restaurant. In *Blakeney,* the Sixth Circuit found the plain view doctrine applicable to the seizure of a suitcase containing both incriminating and non-incriminating documents. *Blakeney,* 942 F.2d at 1028. The Sixth Circuit's decision in *Blakeney* permitting the seizure of items not specified in the warrant but in plain view is limited to its facts: "Agent Sadowski testified that the brown suitcase contained a 'tremendous amount of paperwork and other items....' He sifted through the items and ... decided to seize the suitcase in its *entirety.*" *Id.* at 1028 n. 13. Because the *Blakeney* court reasoned that it was impracticable for the police officer to "inventory and record at the site of the search the numerous contents of the suitcase ...," the Sixth Circuit concluded the *"seizure of irrelevant items within the suitcase along with the relevant items* does not violate the fourth amendment...." *Id.* at 1028 & n. 13. I have no disagreement with the *Blakeney* decision as applied to its particular and unique set of facts.[2] However, the *Blakeney* decision did not state that police officers may use discretion in executing a warrant, rather it held that

"under the circumstances of this case, probable cause was both immediate and apparent to the executing officers. The incriminating nature of these documents relating to the methamphetamine production was readily apparent to the executing officers who were aware that Blake-

---

**1.** "[T]he warrant must be sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty." La-Fave & Israel, Criminal Procedure § 3.4(f), at 227 (1984) (quoting *State v. Muldowney,* 60 N.J. 594, 292 A.2d 26 (1972)).

**2.** The items seized in the instant case are distinguishable from the facts and items seized in *Blakeney.* Unlike the items seized in *Blakeney,* the seized illegal lottery tickets and proceeds of

the ticket sales, business records, an adding machine, a number of glasses, jars, and bags containing small sums of money came within the scope of the search warrant (lottery tickets not sanctioned by the State—tear tab tickets, money, fruit of a crime, or money used in the commission of a crime, documents constituting evidence of crime). In seizing these items, the law enforcement officers' invocation of the plain view doctrine was proper.

ney was a fugitive from methamphetamine conspiracy charges. For the foregoing reasons, the seizure of these items was not unlawful."

*Blakeney,* 942 F.2d at 1028. Thus, the agent in *Blakeney* did not engage in a general exploratory search in seizing documents related to the drug conspiracy because the items' incriminating nature was immediately apparent. *Id.* Under the unique circumstances of the *Blakeney* case, the seizure of irrelevant items along with the seizure of relevant items to the drug conspiracy did not violate the Fourth Amendment. *Id.* (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 464–69, 91 S.Ct. 2022, 2037–40, 29 L.Ed.2d 564 (1971) (plurality opinion)). The majority misapplies *Blakeney* in stating that items "not in fact necessary for proceedings against the owner [can be seized since they] can always be returned...." Maj.Op. at 302. *Blakeney* does not stand for the proposition that *non-incriminating items may be seized* within the plain view doctrine even though they are determined to be irrelevant and can be returned to the owner at a later date. I read *Blakeney* to hold that only those items whose incriminating nature is immediately apparent may be seized under the plain view doctrine. In its attempt to expand the authority of law enforcement officers beyond the plain view exception's permissible limits, the majority has mischaracterized *Blakeney* as permitting the seizure of any non-incriminating items as they could always be returned to the Hessels.

It is well established that a seizure of evidence in plain view is permitted under the requirements of *Coolidge v. New Hampshire. Coolidge,* 403 U.S. at 465, 91 S.Ct. at 2037. Initially, *Coolidge* states that the police officer must have prior justification for being on the premises in the course of executing a warrant. *Id.* Next, the officer may seize an item in plain view only when he or she *inadvertently* comes across a piece of evidence and it is *immediately apparent* to the officer that the evidence is of an incriminating nature. *Horton v. California,* 496 U.S. 128, 134–36, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990)

(citing *Coolidge,* 403 U.S. at 465–66, 91 S.Ct. at 2037–38).

"[T]he extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."

*Id.*

Despite this accepted precedent, the majority pursues an unjustified line of reasoning without legal support, and takes a giant leap in stating that police officers may seize *"items seen during the search but not incriminating on their face, and items that are not seen but that a more extensive search would bring to light."* Maj.Op. at 302 (emphasis added). If the majority's new and expanded interpretation of the plain view doctrine becomes the law, then the *"immediately apparent"* requirement will cease to exist. The Supreme Court in *Coolidge* and most recently in *Horton* explained that "not only must the item be in plain view, *its incriminating character must also be 'immediately apparent.'"* *Horton,* 496 U.S. at 136–38, 110 S.Ct. at 2308 (quoting *Coolidge,* 403 U.S. at 491, 91 S.Ct. at 2038) (emphasis added). Without the "immediately apparent" requirement, police officers unauthorized to exercise discretion now would be free to exercise discretion and seize items in plain view even if the items' incriminating nature were not immediately apparent. *See Horton,* 496 U.S. at 136–38, 110 S.Ct. at 2308; *Coolidge,* 403 U.S. at 491, 91 S.Ct., at 2038. Thus, I disagree with the majority that police officers should be able to use their discretion in seizing items in plain view and later "winnow the wheat from the chaff." Maj.Op. at 302. Rather, as stated earlier, I understand the plain view doctrine to mean that law enforcement officers may only seize those items that almost "jump out" at them and *immediately* exhibit an incriminating character when *inadvertently* discovered in plain view. *Horton,* 496 U.S. at 134–36, 110 S.Ct. at 2307; *Payton v. New York,* 445 U.S. 573, 588, 100

S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *see Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (Scalia, J.). For example, if the law enforcement officers have a search warrant authorizing the seizure of stolen merchandise, fruits of a crime, *i.e.* a *Motorola* television from a home, but upon executing the warrant they discover it is a *Zenith* T.V. with serial and/or identification numbers corresponding to those described in the warrant and it immediately appears to be connected with the criminal activity detailed in the warrant, the seizure of the Zenith television would be permissible. *See, e.g., United States v. Jefferson*, 714 F.2d 689, 694 (7th Cir.1983) (where the furs, jewelry and firearms seized under the plain view exception possessed an immediately incriminating character as fruits of the illegal drug dealing operation); *cf. Hicks*, 480 U.S. at 324, 107 S.Ct. at 1152 (where the police seized two sets of expensive stereo equipment in a squalid apartment after verifying they were stolen from the equipment's serial numbers).

On the one hand, the majority recognizes that there are limits to the police officers' powers and would "not like to be understood as suggesting that a search warrant gives the executing officers a blank check." Maj.Op. at 302. The majority further gives police officers a "blank check" and permits them to seize items that were neither inadvertently discovered nor immediately apparent to them as being connected with criminal activity. Maj.Op. at 302 (citing *United States v. Jefferson*, 714 F.2d 689, 694 (7th Cir.1983); *United States v. Blakeney*, 942 F.2d 1001, 1028 (6th Cir.1991); *cf. Andresen v. Maryland*, 427 U.S. 463, 479–82, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976)). The panel, in justifying its giving of discretion to police officers, considers that unless the warrant is "flexibly interpreted" those items not incriminating on their face or not seen in plain view would evade seizures. Maj.Op. at 302. The panel's reasoning that the plain view doctrine should be expanded to include those *non-incriminating items that would evade sei-*

*zure* is unnecessary in the 1990s considering the fact that the police officer today, including federal and many local law enforcement officials, can obtain a search warrant via the telephone in many jurisdictions. *United States v. Cuaron*, 700 F.2d 582, 586–88 (10th Cir.1983); Adam K. Peck, *The Securing of the Premises Exception: A Search for the Proper Balance*, 38 Vand.L.Rev. 1589, 1601–10 & n. 75 (1985). In fact, the Federal Rules of Criminal Procedure authorize a magistrate to issue warrants based on telephone communications if (1) the officer provides sworn oral testimony over the phone; (2) the officer prepares a "duplicate original warrant" that will reflect verbatim what is read over the phone to the magistrate who prepares the "original warrant;" and (3) the magistrate issues the warrant, after finding probable cause, "by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant." *Cuaron*, 700 F.2d at 588 (quoting Fed. R.Crim.P. Rule 41(c)(2)). Alternatively, the police may "secure the premises" with another officer standing guard and perform the search of the dwelling or building upon the arrival of the search warrant. *United States v. Agapito*, 620 F.2d 324, 337 (2d Cir.1980); *United States v. Diaz*, 577 F.2d 821, 824 (2d Cir.1978); Adam K. Peck, *The Securing of the Premises Exception: A Search for the Proper Balance*, 38 Vand. L.Rev. 1589, 1603–05 (1985). In *Diaz*, the court noted that because the police were without probable cause to arrest the defendant's wife and children, the only practical means of preserving the evidence consisting of $14,000 and a telephone book related to the drug conspiracy was for the police to stand watch over the occupants and the premises until a warrant arrived and then seize the evidence. *Diaz*, 577 F.2d at 824 n. 3. Because the "securing of the premises" is often the most practical means of preserving possibly incriminating items, as in *Diaz*, the police should secure the premises and/or wait the arrival of an officer to seize the incriminating items described in the warrant. *See id.*

There is a reason the plain view doctrine limits the seizure of inadvertently discover-

ed items (in the Hessels' case, illegal lottery tickets, the ticket proceeds, business records, and an adding machine) to items that possess an *incriminating* character. *See United States v. Jefferson,* 714 F.2d 689, 694–95 (7th Cir.1983). The rationale for the plain view exception is that a plain view seizure "will not turn an initially valid (and therefore limited) search into a 'general' one...." *Horton,* 496 U.S. at 136–38, 110 S.Ct. at 2308 (quoting *Coolidge,* 403 U.S. at 469–71, 91 S.Ct. at 2040–41). As the Seventh Circuit in *Jefferson* stated, a "logical nexus" must exist between seized but unnamed items and those items listed in the warrant to permit the seizure of the unnamed items within the plain view doctrine. *Jefferson,* 714 F.2d at 695. Were we to expand the scope of the plain view doctrine beyond the logical nexus the court described in *Jefferson,* search warrants could be interpreted so broadly that officers would be seizing items outside the scope of the warrant.

I write separately to emphasize my concern with the court's unwarranted expansion of the plain view doctrine to include the seizure of irrelevant and non-incriminating items not described in the search warrant. "A man's home is his castle" into which "not even the King may enter." *Cf. Rowan v. United States Post Office Dept.,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970); *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1571 (7th Cir.1986); *see also Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983) (police officers may seize items in the course of executing a search warrant that they honestly and sincerely believe is part of the criminal activity); *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) ("the search must be limited in scope to that which is justified by the particular purposes served by the exception"). Thus, I concur in the majority's result, but disagree with the majority's expansion of the plain view doctrine.