UNITED STATES, Appellee,

v.

Felix G. FOGG, Staff Sergeant, U.S.
Marine Corps, Appellant.

No. 98–0910.
Crim.App. No. 98–1958.

U.S. Court of Appeals for
the Armed Forces.

Argued March 3, 1999.

Decided Sept. 30, 1999.

CRAWFORD, J., delivered the opinion of the Court in part. COX, C.J., concurred in part and in the result without opinion. SULLIVAN and EFFRON, JJ., filed opinions concurring in part and in the result. GIERKE, J., filed a dissenting opinion.

For Appellant: *Mary T. Hall* (argued); *Major S.D. Chace*, USMC (on brief).

For Appellee: *Lieutenant Janice K. O'Grady*, JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler*, USMC; *Commander Eugene E. Irwin*, JAGC, USN, and *Captain D.R. Fields*, USMC (on brief).

*Amicus Curiae* Urging Reversal: *Berna M. Lee* (Law Student) (argued); *Steven H. Goldblatt* (on brief)—For Appellate Litigation Program, Georgetown University Law Center.

Judge CRAWFORD delivered the opinion of the Court, in which COX, Chief Judge, and SULLIVAN and EFFRON, Judges, joined in part.

Pursuant to his pleas, appellant was convicted of conspiracy to distribute cocaine;[1] distribution of cocaine (3 specifications); and possession of marijuana with intent to distribute, in violation of Articles 81 and 112a, Uniform Code of Military Justice, 10 USC §§ 881 and 912a, respectively. Contrary to his pleas, he was convicted by officer members of distributing marijuana and cocaine; rape; indecent assault; and committing indecent acts, in violation of Articles 112a, 120, and 134, UCMJ, 10 USC §§ 912a, 920, and

934, respectively. The convening authority approved the sentence of a dishonorable discharge, confinement for life, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence except for confinement in excess of 30 years. We granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS VIDEOTAPES WHICH WERE VIEWED AND SEIZED DURING A SEARCH OF APPELLANT'S RESIDENCE, WHEN THE WARRANT FOR THE SEARCH, ITS APPLICATION, AND ACCOMPANYING AFFIDAVIT MADE NO MENTION OF VIDEO CAMERAS OR VIDEOTAPES.

We hold that seizure of the videotapes was reasonable for the reasons set forth below.[2]

## FACTS

An informant identified appellant as trafficking in drugs, and he was targeted by the civilian police for controlled drug buys. The informant introduced appellant to an undercover police officer, Detective Sergeant Ralph Hines, who subsequently made three purchases of cocaine. A fourth buy was scheduled, at which the police intended to arrest appellant, but appellant failed to show up.

For the first buy, the informant paged appellant to set up the meeting in a Burger King parking lot and then used a pre-arranged signal to indicate to him that they were ready to buy drugs. The informant asked for $50 worth of crack cocaine, which appellant produced and she bought. Detective Hines said to appellant, " 'Well, that looks pretty good,' and asked him if [he] could get another $50." Appellant hesitated, then walked away for about 5 minutes, and, when he returned, told Detective Hines that he only had $30 worth. Appellant told the detective to contact him "through the infor-

---

1. Appellant pleaded guilty except for the words "Omar Fogg and." Prior to findings these words were stricken from the specification, and appellant then pleaded guilty to the specification as amended.

2. This case was argued at Georgetown University Law Center, Washington, D.C., as part of the Court's "Project Outreach." *See* 38 MJ 136, 137 n. 1 (CMA 1993).

mant" for future purchases because his phone was "rigged" to detect whether incoming calls were using recording devices.

The second buy, also at Burger King, was interrupted when appellant and his look-out, who was later identified as appellant's son, became suspicious because an unmarked police car drove by the parking lot. When the buy resumed, Detective Hines talked with appellant about appellant's "operational techniques." Appellant "pointed to the Burger King camera, [and] said that he had somebody in there monitoring that." The informant also told Detective Hines that appellant was taking pictures of those purchasing drugs from him so that he could "check them out." Detective Hines, the informant, and others described appellant as "high tech" and an "upper class" dealer who "kept records and a gun sometimes...."

By the time of the third buy, the police department had identified appellant as a Marine and was cooperating with the Naval Criminal Investigative Service, which assisted with surveillance, including videotaping the Burger King parking lot. Detective Hines testified that surveillance is sometimes used in drug enforcement work. In addition to the police using video and other surveillance equipment, it was common knowledge in the law enforcement community that drug dealers also often used such equipment.

While waiting at the Burger King for the third buy, appellant called Detective Hines and the informant at a pay phone and said that the police were in the area. As a result, appellant wanted to meet them elsewhere. As they pulled out of the parking lot, Detective Hines saw appellant's van and thought that appellant was probably engaged in surveillance of them. Detective Hines radioed his back-up "not to follow" them as that would tip off appellant to his true identity. Eventually, they met for the third buy and appellant quickly gave Detective Hines some cocaine. Testing appellant's underworld acumen, the detective remarked that a car across the street belonged to the Jacksonville Police Department, when in fact it did not. Appellant replied, no, and then described in detail how he identified their unmarked cars.

At the third buy, appellant promised to trade "two blocks of crack cocaine for a pound of marijuana," in which Detective Hines had previously indicated he trafficked. Detective Hines was not wearing a body wire to record this conversation because he knew that appellant sometimes used an RF detector, which could detect a wire, and thought that he could be using it then. Appellant failed to show up for this fourth buy because the informant told appellant that Detective Hines was an undercover police officer.

Because appellant had been tipped off, the police thought it was important to move quickly to obtain a search warrant before he destroyed any evidence and the value of this operation was lost entirely. Detective Hines indicated that there were a number of items that they were looking for, such as counter-surveillance equipment, which were mentioned in his affidavit attached to the search-warrant application but not on the application itself. This difference was simply the product of their being "rushed." Detective Hines testified that counter-surveillance equipment includes "RF detectors, photos, cameras, binoculars, anything that can be used for surveillance, video."

The warrant authorized seizure of "crack cocaine, packaging and repackaging equipment, papers proving occupancy, records, weapons, pagers, RF detectors, photos, cellular phone[s], police scanners, scales/paraphernalia." During the search of appellant's bedroom, Detective Hines picked up a video camera and noticed a tape inserted in it. He decided to view the tape to see if he had been caught on film in appellant's surveillance operations.

Detective Hines also testified:

Q. When you were viewing these things, what gave you the authorization to search a cam corder? Is cam corder specifically listed on your search warrant?

A. No, sir.

Q. Why did you think you had authorization to search for a cam corder?

A. For the counter-surveillance equipment.

Q. Is there any other reason?

A. (No response.)

Q. Did the fact that photos was listed—

A. Photos also, yes, sir.

Q. When you were looking at the cam corder, did you believe that that was something you had authority to look for?

A. Yes, sir.

Q. You stated that you took that first tape out. What did you do after that?

A. I put in the other tape.

Q. What were you going to do with that first tape?

A. Hold it for evidence.

Q. Why? What did you believe it was evidence of?

A. The marijuana growing in the—see, I am looking through an eyepiece that's the size of a quarter. You can't really tell, but you can see something growing inside of it, and you can't tell what it is until you put it up on something bigger.

Q. At that point, you then determined that that was seizable?

A. Yes, sir.

Q. What happened with the second tape?

A. The second tape showed a scene with a girl in it.

Q. Did you believe that the second tape was evidence of some crime?

A. Yes, sir.

Q. Without elaborating greatly, describe why you believed it was evidence of a crime.

A. Contributing to the delinquency of a minor. It looked like she might have been a little intoxicated, and he is the only person there at the residence that I knew who was old enough to buy beer or liquor, and as I am rewinding that, it shows him setting up the camera.

Q. Him being the accused?

A. Yes, sir.

Q. What did you then elect to do with that tape?

A. I just told them to seize the whole bag and we'll sort it all out, because it was at least contributing to the delinquency of a minor if nothing else.

On cross-examination, Detective Hines indicated that the tape had no outwardly "apparent evidentiary value." But he thought the videotape "could have been counter-surveillance taped footage of the buy occurring or something to that effect with me on it." He further admitted that a videotape was not a photograph. Detective Hines believed that this tape contained pictures of intoxicated young girls and a person believed by the officer to be one of appellant's sons engaged in sexual activities with them. According to the court below, 1998 WL 238588:

> Using the seized cassette, the police eventually identified, located, and interviewed three young girls (aged 13 to 15) shown on the tape. The police also questioned the appellant's two sons about the content of the seized videos. During the interviews with the girls and the sons, the police obtained the evidence used by the Government to convict the appellant of the contested offenses. That derivative evidence established that the appellant directed his sons to invite the girls to his house; provided alcohol or drugs to the girls so that they would become incapacitated; video taped two of the incapacitated girls being sexually compromised by one of the sons at his direction; and raped one of the incapacitated girls.

Unpub. op. at 4.

In a motion to suppress the search results, the defense argued that the search warrant was unconstitutionally vague and the officers exceeded the scope of the search warrant. The judge denied the motion by ruling that the word "photos" in the warrant gave the police authority to seize and view the videotapes. He also found the officers acted in good faith.

While the Government argued at trial that the videotapes might be part of "counter-surveillance equipment," this "factual proposition" was never "presented to the magistrate." Unpub. op. at 6. While the court below determined that photos do not include cassettes, it nevertheless applied the good-faith exception and found the tapes to be admissible. *Id.* at 6–7. The court indicated that the officers acted in good faith, that "[t]heir testimony, along with their reference to 'counter-surveillance equipment' in the affidavit, demonstrates that they were con-

cerned that the appellant had obtained the visual image of the undercover detective." *Id.* at 7. Because appellant might have recorded some of the controlled drug deals, the police wanted to ensure that the identity of the undercover officer was not compromised.

Appellant implies that the military judge erred when he found that appellant "told [Detective] Hines that he had a friend who worked in the Burger King and that the friend could direct the Burger King drive-up video camera to the parking lot to video any transactions and look for police," as well as "that the accused often took pictures of those who bought from him and passed them around to see if they were law enforcement agents." Appellant contends that two issues arise out of these erroneous findings of fact.

### (I) Valid Warranted Seizure

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This Amendment protects the right to privacy against unreasonable searches. Warrants must be based on probable cause and specifically describe the things to be seized and the place to be searched.

We hold that there was a valid, warranted seizure of the videotape because the video tapes were covered by the scope of the search warrant.

■ Officers in executing a search warrant are often required to exercise judgment as to the items or things to be seized. *Strauss v. Stynchcombe,* 224 Ga. 859, 165 S.E.2d 302, 303 (1968). In exercising this judgment, the police are "not obliged to interpret [the warrant] narrowly." *Hessel v. O'Hearn,* 977 F.2d 299, 302 (7th Cir.1992);

*see also United States v. Stiver,* 9 F.3d 298 (3d Cir.1993), *cert. denied,* 510 U.S. 1136, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994). While police officers are required to make realistic, commonsense determinations as to what constitutes evidence, this determination must be based on probable cause. The issue we address in this section is whether the videotapes could be seized within the scope of the search warrant.

We hold that the action of the police in seizing the videotapes fell within the scope of the search warrant, which authorized seizure of "photos." "Photos," as defined by both Mil.R.Evid. 1001(2), Manual for Courts–Martial, United States (1995 edition),[3] and North Carolina Rule of Evidence 1001(2), include videotapes. While these rules are not controlling in this case, they are indicative of the plain meaning of the word. Additionally, case law supports this seizure.

In *United States v. Lowe,* 50 F.3d 604 (8th Cir.), *cert. denied,* 516 U.S. 900, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995), a case similar to the one at bar, Lowe, a convicted felon, was indicted for distribution of cocaine. Police officials applied for a warrant to search Lowe's residence for various evidence, including "photographs" and other "[i]tems of personal identification" which would tend to show the identity of Lowe's co-conspirators. During the search, police came across a videotape. The videotape contained pictures of Lowe and his co-conspirators holding firearms. After viewing the tape, the prosecution also charged Lowe as a felon in possession of ammunition and firearms.

The videotape was the only incriminating evidence on the firearms-possession charge. The Eighth Circuit applied a standard of "practical accuracy" in reviewing the sufficiency of the warrant and recognized that "specificity . . . hinges on the circumstances of each case." In upholding the trial court's admission of the videotape and concluding the warrant was constitutionally valid, the court determined that the videotape "depicted" Lowe; it was evidence of identification of

---

**3.** All Manual provisions are cited to the version applicable at trial. The 1998 version is un-

changed, unless otherwise indicated.

Lowe and his co-conspirators; and the videotape did not exceed the scope of the search warrant even though it did not explicitly mention the word "videotape." The Eighth Circuit observed: "The failure of the warrant to anticipate the precise form in which pictorial identification of [the defendant] ... would appear is not fatal." 50 F.3d at 607.

In analogous situations, courts have upheld seizure of audiotapes. In *United States v. Reyes,* 798 F.2d 380 (10th Cir.1986), the court held that a warrant authorizing seizure of "drug trafficking records" included records contained on an audio cassette tape. In upholding admission of the audio tapes, the court stated that "in the age of modern technology and commercial availability of various forms of items, the warrant could not be expected to describe with exactitude the precise form the records would take." *Id.* at 382–83. Additionally, in *United States v. Peters,* 92 F.3d 768, 769, 770 (8th Cir.1996), unmarked audio tapes found during a search were held to be within the scope of a search warrant authorizing the search and seizure of "any records or documents associated with cocaine distribution." *See also United States v. Lucas,* 932 F.2d 1210, 1215–16 (8th Cir. 1991) (answering machine tape was sufficiently described as "records" in search warrant), *cert. denied,* 502 U.S. 869, 112 S.Ct. 199, 116 L.Ed.2d 159 (1991); *United States v. Meriwether,* 917 F.2d 955, 958 (6th Cir.1990) (warrant authorizing seizure of phone numbers sufficient to cover phone number seized from pager; court interpreted the warrant as authorizing seizure of numbers "in whatever form they may appear"); *United States v. Truglio,* 731 F.2d 1123, 1128 (4th Cir.) ("audio cassettes fit the description of 'records' within a practical margin of flexibility"), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984), *overruled on other grounds* in *United States v. Burgos,* 94 F.3d 849, 861–62 (4th Cir.1996), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997); *United States v. Gomez–Soto,* 723 F.2d 649, 655 (9th Cir.) (microcassette properly seized; failure of warrant to anticipate

"precise container" in which evidence might be found was "not fatal"), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Beusch,* 596 F.2d 871, 877 (9th Cir.1979) (holding that if seized item is "reasonably related to the purposes of the search," it should not be suppressed). Therefore, we hold that the military judge properly ruled that the word "photos," which were covered by the warrant, included videotapes.

Although not necessary for our opinion and not part of our holding, there are, in my view, three alternative theories which support upholding the search in this case: (II) the plain-view doctrine; (III) the good-faith exception; and (IV) the independent-source doctrine.[4]

### (II) Plain View

 The "plain-view doctrine" allows law enforcement officials conducting a lawful search to seize items in plain view if: 1) they are acting within the scope of their authority, and 2) they have probable cause to believe the item is contraband or evidence of a crime. *See* Mil.R.Evid. 316(d)(4)(C), Manual, *supra; see also United States v. Wisniewski,* 21 MJ 370 (CMA 1986) (holding that sergeant peering into window of appellant's barracks room did not violate legitimate expectation of privacy because sergeant made plain-view observation from common walkway where any passerby could have made the same observation), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986); *United States v. Bonfiglio,* 713 F.2d 932 (2d Cir.1983); *United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *but see United States v. Kaliski,* 37 MJ 105, 108 (CMA 1993) (law enforcement officers were not lawfully present on patio at the time of observation so search was unlawful).

 "The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property

---

4. Chief Judge Cox agrees with alternative theories II and III, and reserves judgment as to alternative theory IV. Judges Sullivan and Ef- fron do not agree with any of the alternative theories.

with criminal activity." *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion). Detective Hines was lawfully present at the time of the seizure. The issue is whether Detective Hines had reasonable grounds to believe the videotape probably constituted evidence of a crime. We hold that he did. The detectives knew generally that drug dealers will keep records and note by various means who was present at their sales transactions in order to protect themselves and to obtain payment. *Cf. United States v. Reyes, supra.* In addition, these detectives had specific information that this dealer used video and other "high-tech" equipment to record his drug transactions and keep tabs on his buyers.

Obviously, appellant's statement to Detective Hines that he "had somebody in there monitoring" while pointing to a camera, implies that the person and appellant were associates or that, at least, appellant wanted Detective Hines to believe they were associates. The military judge's finding that appellant's "friend" monitored the drug transfer by video was accurate. Whether appellant could actually access the monitoring equipment or record activities in the parking lot for his own use is not the issue. The issue is what Detective Hines believed based on what the informant and appellant told him during these controlled drug transactions. The military judge's finding of fact is based on Detective Hines' reasonable beliefs about appellant's illicit activities at the time the detective applied for and executed the warrant. His finding that appellant told the detective that his "friend could direct the Burger King drive-up video camera to the parking lot to video any transactions and look for police" is supported by Detective Hines' testimony. Further, neither appellant nor any other witness testify that appellant did not have a "friend" monitoring the video camera in the Burger King or that he could not video transactions and look for police. Therefore, absent any evidence to the contrary, we conclude that the military judge's finding of fact on this issue is fully supported by the record.

Appellant claims that this was error because Detective Hines subsequently testified that the informant had told him that appellant would want to see a picture identification of him to check him out for the sale. Further, the detective testified that he had not personally seen any counter-surveillance equipment. Appellant contends that, thus, "there was insufficient reason to believe" that there would be photos and counter-surveillance equipment in appellant's home. Final Brief at 8. Though the detective scrupulously avoided ever handing his photograph to appellant, to suggest that this is the only method that appellant could have had for obtaining some record of Detective Hines' identity is to ignore the balance of the detective's testimony. Appellant's own statements to the detective about his use of sophisticated recording devices and a video monitor at the Burger King drive-through dictate against such a conclusion.

At the very least, the statements were smoke-and-mirrors used by a drug dealer to leave his buyer with the distinct impression that he was being watched and could be later identified for some nefarious purpose should he forget his place in this power relationship. Additionally, the conduct and behavior which Detective Hines observed—appellant's son surreptitiously warning appellant of a nearby unmarked police car; appellant's last minute change in the location of the third buy because of suspected police surveillance; the positioning of appellant's van as if to watch the detective when appellant changed that location; and appellant's acute skill in identifying unmarked police vehicles—all support Detective Hines' belief that appellant's statements were accurate and truthful. This is above and beyond the general knowledge the detective already had from years of experience in drug enforcement and undercover work.

Thus, even if the videotapes were not within the scope of the warrant, they were properly seized by virtue of the plain-view doctrine.

### (III) Good–Faith Exception

■ An alternative ground for upholding the search is the good-faith exception. Mil. R.Evid. 311(b)(3); *see also United States v. Chapple,* 36 MJ 410 (CMA 1993); *United States v. Lopez,* 35 MJ 35 (CMA 1992).

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405 (1984), the Court applied the good-faith exception to a facially valid search warrant. The "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922, 104 S.Ct. 3405. This exception will not apply if the officers do not "have a reasonable knowledge of what the law prohibits." *Id.* at 920 n. 20, 104 S.Ct. 3405. Nor will it apply to "bare bones" affidavits; there must be some meat into which the magistrate authorizing the search can sink his teeth. *Id.* at 915, 104 S.Ct. 3405; *Lopez, supra* at 42. Nor will the good-faith exception apply if the information in the affidavit is false or provided recklessly. 468 U.S. at 914, 104 S.Ct. 3405, 35 MJ at 41. This exception also would not apply when the officers' search is not reasonably limited to "only those places and for those objects that it was reasonable to believe were covered by the warrant." 468 U.S. at 918 n. 19, 104 S.Ct. 3405.

None of these exceptions to the good-faith doctrine are implicated by the facts of this case. Detective Hines did not specifically include videotapes in his affidavit because he and the other officers believed that evidence might be destroyed and so they rushed. In effect, by seeking the warrant he was protecting appellant's rights. There were good grounds for the police to believe that because appellant was tipped off by the informant, the evidence might be destroyed and a warrantless search based on exigent circumstances could have been made. The police should not be penalized for seeking a warrant, however hastily.

Furthermore, the exclusionary rule, suppressing evidence from unreasonable searches and seizures, is not a constitutional right but "a judicially created remedy designed to safeguard Fourth Amendment rights...." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Certainly the search in this case was such that a thoughtful and competent judge signed the warrant. As in *Leon,* the extreme sanction of the exclusionary rule would be inappropriate. The officers were not trying to ignore or subvert the Fourth Amendment; in fact, they were protecting the right to privacy by obtaining a search warrant, rather than making a warrantless entry. A dispute as to what the word "photos" means is not sufficient to justify invoking the exclusionary rule in light of the case law cited above regarding the scope of the search, the good-faith exception, and the plain-view doctrine. By seeking a warrant, the police interjected into unexpectedly disordered circumstances an orderly procedure by a neutral and detached magistrate who determined what actions could be taken.

### (IV) Independent–Source Doctrine

■ Assuming for the sake of argument that the foregoing was not applicable to the videotapes seized and appellant had prevailed in his challenge, the evidence of the sexual offenses derived from the tapes would still be admissible. The independent-source doctrine may be applied when the evidence is actually obtained through the independent and voluntary acts of third parties. *See United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ("[T]he more apt question ... is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (Citation omitted)). Certainly, there is an independent source in the testimony of the victims which, in this case, was the product of their voluntary acts. Once questioned, all of the victims were willing to come forward as cooperative witnesses.

In *United States v. Karathanos,* 531 F.2d 26, 35 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976), "[t]he

purpose of the search, as described in the application for the warrant, was to seize the illegal aliens; it is these same aliens who are now the government's prospective witnesses." Thus, the court considered their testimony to be far from voluntary. Here, however, there is no "close connection" between the initial illegal search and the testimony of the victims which the Government seeks to use at trial. 531 F.2d at 35. The officers neither employed any influence nor made use of the power of their position to coerce these scared and embarrassed young women to testify about the acts perpetrated upon them, making them witnesses of a very different type from the illegal immigrants in *Karathanos.*

## CONCLUSION

The police search and seizure of the videotapes was proper. The police had a reasonable basis for believing that the videotapes might contain pictures of criminal activities. Furthermore, the police had a reasonable belief that the videotapes might contain pictures which could expose the undercover officer's true identity. Finally, it is reasonable for the police to have believed that the scope of the warrant, which authorized seizure of photos, encompassed all forms of photos, including videotapes. It is the reasonable beliefs in the minds of the officers executing the search that frames our inquiry, not the words in the affidavit attached to the application.

Furthermore, under any of the alternative theories presented in this opinion—the plain-view doctrine, the good-faith exception, and the independent-source doctrine—the evidence would be admissible. The exclusionary rule should not be applied to exclude relevant and reliable evidence. To rule otherwise would be to impose too high a cost on society.

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

EFFRON, Judge (concurring in part and in the result):

I concur in Part I of the majority opinion. I agree with Judge Gierke's dissent with respect to Parts II–IV.

SULLIVAN, Judge (concurring in part and in the result):

I would affirm this case on the basis that the challenged videotape evidence was seized during a lawful search conducted pursuant to and within the scope of a valid warrant. *See United States v. Lowe,* 50 F.3d 604, 607 (8th Cir.), *cert. denied,* 516 U.S. 900, 116 S.Ct. 260, 133 L.Ed.2d 183 (1995).

GIERKE, Judge (dissenting):

I disagree with the majority's holding that the videotapes were included within the scope of the warrant. The court below held that videotapes were not within the scope of the warrant. Unpub. op. at 6. The agent who executed the warrant did not believe that the term "photos" included videotapes. The case cited by the majority, *United States v. Lowe,* 50 F.3d 604 (8th Cir.1995), does not, in my view, support the position that the term "photos" includes videotapes. In *Lowe* the warrant authorized seizure of items "of personal identification," and the videotapes that were seized were labeled with the defendant's "street name." *Id.* at 607. *Lowe* stands for the proposition that videotapes labeled with the defendant's name were items of "personal identification"; it does not support the proposition that videotapes are "photos."

A warrant must specifically list the items to be seized. *Lo–Ji Sales v. New York,* 442 U.S. 319, 325, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). In this case, the videotapes were not within the scope of the warrant. The decision to seize and view appellant's videotapes was the product of discretion exercised by the same NCIS agent who had testified that he did not think that videotapes were within the scope of the warrant.

In *United States v. Melendez,* 1990 WL 109201 at *4 (E.D.N.Y. July 20, 1990), a federal district court held that photos seized

under a warrant that authorized seizure of videotapes were illegally seized, because they were not within the scope of the warrant. In *People v. Burke*, 180 Misc.2d 715, 690 N.Y.S.2d 897 (N.Y.Sup.Ct.1999), a New York trial court held that a warrant for "photographs of the complaining witnesses as well as other children, as well as diaries, journals, computer disks, NAMBLA [North American Man–Boy Love Association] literature, child-related paraphernalia, photographic equipment, receipts from photo developing stores, and photo albums," *id.* at 905, did not authorize seizure of "apparently unmarked" videotapes "strewn about the apartment" and not stored with identifiable pornographic materials that were lawfully seized. *Id.* at 906, 905.

Similarly, in *Commonwealth v. Friedman*, 411 Pa.Super. 628, 602 A.2d 371, 378, 380 (1992), the Superior Court of Pennsylvania held that videotapes were not within the scope of a warrant authorizing seizure of photos and sketches. While the Pennsylvania Constitution has a more stringent requirement for particularity in a warrant than the United States Constitution, *Friedman* is persuasive authority for the proposition that the word "photos" does not include videotapes. *Friedman* relies on the distinction between "visual information" such as "photos and sketches," where the evidentiary value is immediately apparent, and items such as movie film and videotapes that require a second intrusion into the owner's privacy in order to determine if they have evidentiary value. This same distinction was made by the Supreme Court in *Walter v. United States*, 447 U.S. 649, 654–57, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (opinion of Stevens, J.).

I also disagree with the lead opinion's conclusion that the search can be upheld under the good-faith exception, plain view, or the independent-source doctrine. The good-faith exception applies only when the police rely on the terms of the warrant. *See United States v. Leon*, 468 U.S. 897, 922–23, 104 S.Ct. 3405 (1984) (good-faith exception requires reliance on a warrant that is objectively reasonable); *cf. Massachusetts v. Sheppard*, 468 U.S. 981, 988, 989–91, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (good-faith exception applied where officers searched for items not in fact authorized by warrant after being assured by magistrate that the warrant was sufficient to cover items sought). I find it hard to say there was good-faith reliance on the warrant when the agent who executed the warrant did not believe that "photos" included videotapes.

I likewise disagree with the lead opinion's conclusion that the videotapes were lawfully seized because they were in plain view. The NCIS agents were investigating a drug case. There was nothing on or around the tapes that identified them as evidence of a crime. *See Walter*, 447 U.S. at 653, 659–60, 100 S.Ct. 2395 (opinion of Stevens, J.) ("plain view" rejected where contents of films "could not be determined by mere inspection" without use of a projector); *see also Burke*, 690 N.Y.S.2d at 906 (plain view doctrine not applied where videotapes were unmarked and not stored with other pornographic materials); *DePugh v. Penning*, 888 F.Supp. 959, 997 (N.D.Iowa.1995) (plain view rejected where photo, film, cassettes, and address book were not "of an obvious incriminating character"); *Ross v. State*, 59 Md.App. 251, 475 A.2d 481, 486–87 (1984) (plain view rejected where videotapes had no markings or labels indicating pornographic content).

I also disagree with the notion that the independent-source doctrine applies to this case. Appellant was not suspected of pornography or any sexual crimes. There is no evidence suggesting that the girls would have been identified and located or that they would have voluntarily come forward if the videotapes had not been seized.

In my view, there was no legal justification for seizing and viewing the videotapes. Accordingly, I dissent.