**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 93-8685
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS


GARY HILL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(April 14, 1994)

Before POLITZ, Chief Judge, and KING and DAVIS, Circuit Judges.

DAVIS, Circuit Judge:

After a grand jury returned an eight-count indictment charging Gary Hill with racketeering, conspiracy to commit racketeering, aiding and abetting extortion under color of official right, and aiding and abetting mail fraud, Hill moved to suppress evidence seized during two searches of his law office. Because we find that the district court erred in granting Hill's motion to suppress, we vacate the district court's order and remand for further proceedings.

                                    I.

Government agents conducted two searches of the offices of Hill & Ramos, an El Paso law firm in which Hill was the managing partner. The first search was conducted in May 1992 pursuant to a

search warrant.  The magistrate concluded that the affidavit in support of the warrant established probable cause to believe that Hill and his employees were violating 31 U.S.C. § 5324 (Supp. 1993) by structuring banking transactions to evade currency reporting requirements imposed on banks by federal law.

The May warrant authorized seizure of a wide variety of records for the period from January 1986 through May 1992, including "Bank Statements, Deposit Slips, Canceled Checks, Withdrawal Slips, Debit Memos, and Credit Memos" and "Cash Receipt Journal(s), Cash Receipt Book(s), and Cash Disbursement Journal(s)."  In executing the warrant, IRS and FBI agents apparently seized some items dated before 1986.  The agents also seized, among other items, 2,000 to 3,000 check stubs from the years covered by the warrant.  The warrant did not include the term "check stubs."

The law firm check book had perforated check sheets.  The checks were located on the right side of the sheet and the corresponding check stub or register was on the left side.  Hill used check stubs to record -- in addition to deposit and balance information -- the date, payee, purpose, and tax consequence for each check.  Most of the used check stubs at the law office were held together in bundles with rubber bands and stored with bank statements and canceled checks in drawers and boxes.  The agents executing the May warrant looked at the check stubs on top of the bundle, but did not remove the rubber bands to review the remaining check stubs.  Sometime after the May search, the officers reviewed the individual check stubs and sent them to specialists for further analysis.

In November 1992, the government conducted a second search of the Hill & Ramos offices and seized additional financial records. The warrant authorizing the November search was issued upon a showing of probable cause to believe that Hill had violated 18 U.S.C. § 666 (Supp. 1993) (Theft or bribery concerning programs receiving federal funds). The November warrant authorized the officers to seize check stubs as well as other financial records. The affidavit in support of the November warrant relied in part on information taken from the check stubs seized during the May search.

In April 1993, a grand jury returned an eight-count superseding indictment, charging Hill and two other defendants[1] with conspiracy to commit racketeering, 18 U.S.C. § 1962(d), racketeering, 18 U.S.C. § 1962(c), aiding and abetting extortion under color of official right, 18 U.S.C. §§ 1951 and 2, and aiding and abetting mail fraud. 18 U.S.C. §§ 1341 and 2.

Hill moved to suppress all evidence seized during the two searches. As to the items seized during the May search, Hill argued, inter alia, that the search exceeded the scope of the warrant because the warrant did not authorize seizure of items pre-dating 1986, nor did the warrant authorize seizure of check stubs. The district court suppressed "all items dated before 1986 and all check stubs." Because probable cause for the second search warrant was predicated in part on information contained in the check stubs, the district court also suppressed all evidence seized during the November search as fruit of the poisonous tree.

---

[1] These two defendants are not parties to this appeal.

3

The government filed a motion for reconsideration, asserting that the district court erred because the check stubs were within the scope of the warrant and, in the alternative, the plain view doctrine applied to the seizure of the check stubs. After a hearing, the district court reaffirmed its previous order. The government filed a motion to stay the proceedings and filed this interlocutory appeal.

## II.

The primary question presented in this interlocutory appeal is whether the district court erred in suppressing certain classes of records seized during the May search -- the check stubs and the records pre-dating 1986. Relatedly and depending on the answer to this question, we must also consider whether the district court erred in suppressing all evidence seized during the November search. We review a district court's findings of fact on a motion to suppress for clear error and its ultimate determination of Fourth Amendment reasonableness de novo. **United States v. Seals**, 987 F.2d 1102, 1106 (5th Cir.), **cert. denied**, 114 S. Ct. 155 (1993).

## A.

The government argues first that the check stubs were within the scope of the warrant even though the express term was not used in describing the property to be seized. The government contends that the May 1992 search warrant authorizes the seizure of one or more categories of records listed in the warrant that subsume the term "check stubs."

In analyzing whether the May search warrant authorized seizure of the check stubs, we start from the bedrock premise that under the Fourth Amendment, no warrants shall issue except those "particularly describing the . . . things to be seized." This constitutional requirement of particularity seeks to prevent general exploratory rummaging and seeks to ensure that the executing officer is able to distinguish between those items which are to be seized and those which are not. **E.g., Marron v. United States**, 275 U.S. 192 (1927).

To satisfy the particularity requirement, the warrant must "'be sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty.'" **See, e.g.**, 2 Wayne R. LaFave, **Search and Seizure -- A Treatise on the Fourth Amendment** § 4.6(a), at 235 (2d ed. 1987) (citation omitted). In identifying the property to be seized, the agents are "required to interpret the warrant," but are "not obliged to interpret it narrowly." **United States v. Stiver**, 9 F.3d 298, 302-03 (3d Cir. 1993), **cert. denied**, 114 S. Ct. 1115 (1994).[2] Stated differently, the particularity requirement requires the search warrant to describe the property to be seized with reasonable specificity, but

---

[2] In **Stiver**, the search warrant authorized seizure of, among other things, "all drug paraphernalia." While executing the warrant, the officers answered the defendant's telephone and took orders from his customers for illegal drugs. The court held that the officers did not exceed their authority under the warrant by answering the telephone. The court explained that the officers were "'required to interpret'" the portion of the warrant authorizing seizure of "all drug paraphernalia," and were "'not obliged to interpret it narrowly.'" **Stiver**, 9 F.3d at 302-03 (citing **United States v. Lucas**, 932 F.2d 1210, 1215-16 (8th Cir.), **cert. denied**, 112 S. Ct. 399 (1991)); **see also Hessel v. O'Hearn**, 977 F.2d 299, 302 (7th Cir. 1992).

not with elaborate detail.  **E.g., United States v. Somers**, 950 F.2d 1279, 1285 (7th Cir. 1991), **cert. denied**, 112 S. Ct. 1959 (1992).

It follows that evidence seized pursuant to a search warrant is not necessarily suppressible merely because the "nomenclature assigned to these items by the defendant might differ from the description contained in the warrant." **United States v. Word**, 806 F.2d 658, 661 (6th Cir. 1986), **cert. denied**, 480 U.S. 922 (1987). For example, in **Word**, the search warrant authorized seizure of specific documents relating to the defendant's medical practice. The defendant complained that the search of his office violated his Fourth Amendment rights because agents seized documents not expressly enumerated in the search warrant.  The court rejected the defendant's argument because the government persuaded the court that the items seized were functionally equivalent to other items specifically listed in the warrant.[3]  Thus, the question whether the evidence seized falls within the scope of the warrant ultimately turns on the substance of the item seized "and not the label assigned to it by the defendant."  **Id.** at 661.

In this case, the record is uncontradicted that in accounting systems, both check stubs and cash disbursement journals serve

---

[3]  Among the items the warrant authorized the agents to seize were "prescription pads, correspondence, patient logs, appointment books, patient payment records, [and] medical records."  The defendant complained that the agents exceeded the scope of the warrant by seizing, among other items, "day sheets," "spiral notebooks for [patient] sign-in," "patient hospital admission records," and "patient encounter forms."  The court declined to suppress the evidence because it accepted the explanation offered by government witnesses that day sheets were used as payment records, that spiral sign-in notebooks were used as appointment books, that hospital admission records were the equivalent of medical records and that encounter sheets contained information regarding billing, patient diagnosis, and treatment history.

6

virtually identical functions.  Both serve to maintain a running balance in an account and to trace the disposition of cash out of that account.  **See** Walter B. Meigs & Robert F. Meigs, **Accounting -- The Basis for Business Decisions** 52-53, 237, 247, 305 (7th ed. 1987) (R. 307-320).  Like check stubs, a cash disbursement journal provides a chronological record of all cash payments. **Id.**  Both also function as a contemporaneous record of transactions.  With respect to each transaction, both the cash disbursement journal and a check stub include the date of the transaction, the debit and credit changes in the account, and a brief explanation of the transaction.  **Id.**  The check stubs seized in this case contained the date of the payment, the name of the payee, a brief explanation of the payment, balance and deposit information, and a space for indicating the tax deductibility of the payment.

In support of its contention that check stubs were the functional equivalent of a cash disbursement journal, the government presented the testimony of Agent Gonzalez, the IRS Special Agent who was the affiant on the May search warrant.  Agent Gonzalez, who holds a business degree in accounting, testified that a cash disbursement journal can take the form of any type of register or record that traces the outflow of cash in daily business transactions.  Agent Gonzalez also testified that in his experience investigating white collar crimes, he often observes service-oriented businesses where check stubs are the only records that perform this function.[4]  According to Agent Gonzalez, the

---

[4]   Agent Gonzalez's testimony that he would not teach an accounting student that cash disbursement journals and check stubs are one in the same does not contradict his testimony that the two

7

check stubs were Hill's only record of cash transaction until the end of each month. At that time, Hill's accountant transmitted the data from the check stubs into a computer to generate a printed cash disbursement journal.

Hill does not argue that check stubs and cash disbursement journals are functionally dissimilar. Rather, Hill argues that the government admitted that a distinction exists between check stubs and cash disbursement journals when it included both terms in the November warrant. Hill also points out that the agents seized computerized cash disbursement journals during the May search and argues that the check stubs would be suppressible if the computerized cash disbursement journals were seized before the check stubs. We infer nothing from the inclusion of the term "check stubs" in the November warrant -- except that the affiant then knew more about the form of Hill's financial records. Nor did the seizure of computerized cash disbursement journals divest the agents of authority to seize functionally equivalent manually produced records. Hill also makes much of Agent Gonzalez's testimony that, when he applied for the warrant, he did not know whether the defendant used check stubs in conducting his financial affairs. But the affiant's lack of knowledge that Hill used check stubs in conducting his business has little, if any, relevance to the question at hand: whether the agents were entitled to seize those documents if the warrant listed functionally equivalent documents. **See, e.g., United States v. Davis**, 589 F.2d 904, 906 (5th Cir.), **cert. denied**, 441 U.S. 950 (1979).

---

documents serve the same function.

We are persuaded that under the facts of this case, the check stubs served the same function as a cash disbursement journal and that a reasonable officer knowledgeable of financial records would have reached this conclusion. Thus, the check stubs were within the scope of the warrant authorizing seizure of a cash disbursement journal. **See Word,** 806 F.2d at 661; **see also Stiver**, 9 F.3d at 302-03.

B.

Even if the check stubs were not within the scope of the search warrant, the check stubs are shielded from suppression under the plain view exception to the warrant requirement. The plain view exception applies when an officer lawfully in a location by virtue of a warrant or some exception to the warrant requirement seizes an item having an incriminating character that is "immediately apparent." **Horton v. California**, 496 U.S. 128, 141-42 (1990). It is not necessary "that the officer know that the discovered res <u>is</u> contraband or evidence of a crime, but only that there be a practical, nontechnical probability that incriminating evidence is involved." **United States v. Espinoza**, 826 F.2d 317, 319 (5th Cir. 1987) (emphasis in original; quotations and citations omitted). In other words, the seizure must be supported by probable cause to believe that the item viewed is either contraband or will be useful in establishing that a crime has been committed. **Arizona v. Hicks**, 480 U.S. 321 (1987).

The district court reasoned that the officers could not obtain probable cause to believe the check stubs were probative of criminal conduct without removing the rubber bands and inspecting

9

the stubs individually, which the officers did not do. We disagree. As soon as the agents saw the check stubs, they were justified in believing that they were useful as evidence of a money structuring offense. Agent Gonzalez explained that check stubs usually reveal the date of the transaction, reveal how money deposited into an account is spent, and may disclose a purpose for the payment. According to Agent Gonzalez, such evidence may be helpful in proving knowledge of currency reporting requirements and the requisite intent to evade them.

We have no doubt that the officers had probable cause to believe that the check stubs would be helpful in establishing the money structuring offense. The agents reached this conclusion from the information gleaned from the check stub on top of the bundle and from their general understanding of information ordinarily included in check stubs. The magistrate judge recognized the probable relevance of other similar financial records in tracing the funds that went through Hill's hands. Check stubs are just as likely to identify the nature of Hill's financial transactions as the documents named in the warrant. The district court in effect recognized the relevance of check stubs when it observed that "if the warrant had simply listed 'check stubs,' there would be no dispute."

Hill argues that the district court was nevertheless justified in suppressing the check stubs because Agent Gonzalez should have known the Hill & Ramos law firm utilized check stubs in maintaining its financial records and carelessly omitted them from the warrant application. This argument -- that an officer can not seize

10

evidence of criminal conduct he should have expected to find but failed to list in the warrant application -- is inconsistent with the Supreme Court's holding in **Horton,** 496 U.S. 128. In **Horton**, a warrant authorized officers to search the home of an armed robbery suspect. The warrant authorized a search for only the stolen property. Although the affiant officer had probable cause to believe that weapons used in the armed robbery were also located in the home, the officer did not list the weapons on the search warrant application. While the officer was executing the warrant, he found the weapons in plain view and seized them as evidence of the suspected robbery.

The Court held that the warrantless seizure of the weapons found in plain view during the lawful search for the stolen property was permissible even though the discovery of the weapons was not inadvertent. The Court rejected the plurality opinion in **Coolidge v. New Hampshire**, 403 U.S. 443 (1971), that the plain view exception only has application if the discovery of the evidence is inadvertent. The Court's reasoning applies with equal force to this case:

> [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant . . .. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant.[5]

---

[5] The Court also adopted Justice White's reasoning from his concurring/dissenting opinion in **Coolidge**:

11

**Horton**, 496 U.S. at 138.

The defendant in **Horton** made the identical argument that Hill makes here:  the inadvertence requirement is necessary to prevent the police from conducting general searches or from converting specific warrants into general warrants.  The Court rejected this argument because the relevant interests are protected by the requirement that no warrant issue unless it "'particularly describ[es] the place to be searched and the persons or things to be seized.'"  **Id.** at 139 (citations omitted).  On the facts presented, the Court concluded that "the scope of the search was not enlarged in the slightest by the omission of any reference to the weapons in the warrant."  The Court held that the seizure of the weapons was proper under the plain view exception.  **Id.** at 141.

The check stubs in this case are closely analogous to the weapons seized in **Horton**.  Agent Gonzalez had probable cause to search the Hill & Ramos offices for check stubs as well as the other financial records.  Apparently, Agent Gonzalez carelessly

---

> Let us suppose officers secure a warrant to search a house for a rifle.  While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated.  The Court would permit the seizure of only one of the photographs.  But in terms of the 'minor' peril to Fourth Amendment values there is surely no difference between these two photographs:  the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other.  And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant.

**Coolidge**, 403 U.S. at 516 (White, J., concurring in part and dissenting in part).

omitted check stubs from the warrant application. During a lawful search for the items listed in the warrant, the agents encountered the check stubs in plain view, which they immediately recognized as relevant to their investigation. We conclude that **Horton** lays to rest all of Hill's arguments that the officers were not entitled to seize the check stubs under the plain view exception to the warrant requirement.

C.

The district court suppressed all documents seized during the May search that pre-dated 1986 because the documents were outside the scope of the warrant. We agree with the district court that documents generated before 1986 are outside the scope of the warrant. On remand Hill should identify which documents he seeks to suppress on this ground so the parties can address these documents specifically and the court can rule on the motion.

D.

The district court suppressed the evidence seized during the November search because probable cause for the warrant was premised in part on information obtained from the check stubs. Because we hold that the agents lawfully seized the check stubs while executing the May warrant, we vacate the order suppressing the evidence seized during the November search as fruit of the poisonous tree.

On remand, the district court should address the remaining arguments raised by Hill in his second motion to suppress. **See United States v. Floyd**, 992 F.2d 498, 500 (5th Cir. 1993).

For the above reasons, the order of the district court is VACATED and this matter is REMANDED to the district court for further proceedings.


POLITZ, Chief Judge, dissenting:


The majority concludes that the seizure of the check stubs was valid either as falling within the scope of the search warrant or under the plain view doctrine. I cannot agree that either premise is factually and legally appropriate herein and therefore must respectfully dissent.

The majority recognizes, as it must, that the May 1992 search warrant authorized the seizure of multiple records for the period January 1986 through May 1992, including "Bank Statements, Deposit Slips, Canceled Checks, Withdrawal Slips, Debit Memos, Credit Memos, Cash Receipt Journal(s), Cash Receipt Book(s), and Cash Disbursement Journal(s)." The warrant did not list "check stubs." This non-inclusion was not inadvertent. Check stubs were not intended to be included. During the hearing on the motion to suppress the district court focused directly on that issue and asked Agent Gonzalez, the responsible agent, why check stubs were not included in the warrant. That exchange between the court and the agent is most informative:

> THE WITNESS: . . . I didn't have any specific information that there were check stubs or carbon copies or anything like that. . . .
>
> . . .

14

THE COURT: I searched all over when I was looking at this for some place that you said "checks" or "checkbooks" so that I could make the leap, but I didn't find that.

THE WITNESS: . . . I didn't--again, I was not informed at the time of what type of checkbook they would have.

THE COURT: Yeah, you know they had, for instance, registers with blue covers. Your source couldn't have told you what type checkbooks they had?

THE WITNESS: Probably it was just an item that I never inquired about. . . .

THE COURT: Mr. Gonzalez, did you really think about check stubs when you were doing this?

THE WITNESS: Not specifically check stubs.

The agent did not seek authority to search for and seize check stubs but between 2000 and 3000 check stubs were nonetheless seized. On the inventory report on the execution of the warrant the officers list, *inter alia*, both "check stubs" and "cash disbursement journals." I take this to reflect that the officers executing the search warrant understood that check stubs and cash disbursement journals were two separate and distinct items. They obviously continued to think so because in a follow-up search warrant authorized and executed in November 1992 the records sought included both "Cash Disbursement Journal(s), and . . . check stubs."

My colleagues in the majority have made a different factual finding than that made by the trial judge and have reached a different legal conclusion. They accept the premise that check stubs are the functional equivalent of a cash disbursement journal and, as such, are within the reach of the search warrant. In their view check stubs are the functional equivalent of a cash disbursement journal because both contain the same information,

i.e., the date, purpose, and amount of the transaction.  One might suggest that the canceled checks would contain that same information.  Are canceled checks to be deemed the functional equivalent of a cash disbursement journal and, as such, subject to seizure under a warrant authorizing the search and seizure of cash disbursement journals?  I surely would hope not.

I am diametrically opposed to the expansion of the scope and reach of a search warrant by any form of legal semantics.  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."[6]  I consider the fourth amendment protections to be much too precious to countenance any type or form of end run.  Let the government representative seeking authority to search advise the neutral magistrate of the object(s) sought and the basis for the belief that probable cause of a criminal offense exists.  Let the magistrate decide whether to grant this extraordinary power to search and seize and the specific scope of that grant.  Then let that search proceed as sought and authorized.  That scenario did not occur here.  The agent candidly acknowledged that he did not seek authority in the May 1992 warrant to search for and seize check stubs.  Notwithstanding, the officers did so.  The district court found and concluded that the officers violated the fourth amendment.  I agree.

---

[6]**Marron v. United States**, 275 U.S. 192, 196 (1927).  See also **Gurleski v. United States**, 405 F.2d 253, 257 (5th Cir. 1968), cert. denied, 395 U.S. 981 (1969).

As an alternative ground the majority concludes that the check stubs were subject to seizure under the plain view doctrine. I do not agree. Agent Gonzalez again candidly admitted that he could not tell from what he could see of the bundled check stubs whether they were relevant to the suspected currency offense. That relevance was not determined until the contents of the other stubs were examined later by IRS agents. This admission flies in the face of the teachings of **Arizona v. Hicks**[7] which requires that a seizure must be supported by probable cause to believe that the item in plain view is either contraband or evidence of a crime. I do not find this requirement satisfied. I would affirm the district court's suppression order and therefore respectfully dissent.

---

[7]480 U.S. 321 (1987).

17