# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1954

_____

| | | |
|---|---|---|
| Cyndi McClendon, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Story County Sheriff's Office; Paul H. | * | |
| Fitzgerald; Story County Animal | * | |
| Control Department; | * | |
| | * | |
| Defendants, | * | Appeal from the United States |
| | * | District Court for the |
| Sue McCaskey; Brenda Rogers; | * | Southern District of Iowa. |
| | * | |
| Defendants-Appellants, | * | |
| | * | |
| Atkinson, Deputy; Upchurch; Denny | * | |
| Watson, Deputy; McKinney, Deputy; | * | |
| Thomas, Deputy, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: November 18, 2004
Filed: April 4, 2005

_____

Before MURPHY, LAY, and MELLOY, Circuit Judges.

_____

LAY, Circuit Judge.

This case originated as a claim alleged against several public officials pursuant to 42 U.S.C. § 1983. Plaintiff Cyndi McClendon claimed that the Defendants violated her Fourth Amendment rights by seizing items not identified in the relevant search warrant. The issue is whether the district court erred in partially denying the Defendants' motion for summary judgment because it concluded that a genuine issue of material fact existed as to whether Animal Control Officers Sue McCaskey and Brenda Rogers were entitled to qualified immunity. Allegations against all other public officials named as Defendants were dismissed by the district court. We reverse the decision of the district court and hold that McCaskey and Rogers were entitled to qualified immunity. We affirm the dismissal of all other Defendants.

## I. Background

In May, June, and July of 2001, numerous complaints and reports of animal neglect were made to various animal welfare agencies, including Iowa's Story County Animal Control Department. These complaints alleged that the horses owned by McClendon were neglected, starving, very ill, and roaming at large on county property.

McCaskey and Rogers obtained permission to inspect the McClendon property on June 6, 2001. They found loose horses; thirty-seven horses in over-crowded pens; highly dangerous barnyard conditions including collapsing shelters, excessive manure, broken fences, and dangerous debris (e.g., protruding metal posts, barbed wire); a lack of water despite hot conditions; and signs of serious illness. *See* McCaskey Aff. dated June 10, 2003 ("McCaskey Aff. No. 1") at *passim* in Jt. App. at 27; Rogers Aff. at 2; Order on Cross-Motions for Summary Judgment ("Order") at 2-3. The Officers' "first impressions were that the entire herd was malnourished," including some pregnant mares and foals. *See* McCaskey Aff. Attached to Search Warrant Application ("McCaskey Aff. No. 2") in Jt. App. at 64; Rogers Aff. at 3. McClendon was the sole person caring for the herd, yet she lacked the equipment or

supplies necessary to care for the herd. McClendon claimed she fed the horses alfalfa cubes because she could not find hay, but there was no horse feed of any sort on the property at that time, and Animal Control had already been informed that McClendon was denied hay for failure to pay her bills.

Over the next five weeks, McCaskey and Rogers made additional visits to the property and found the conditions unchanged. Finally, on July 12, 2001, the Officers brought Nicole Snider, a Livestock Inspector for the Iowa Department of Agriculture, and Dr. Kim D. Houlding, D.V.M., to inspect the herd pursuant to McClendon's consent. *See* Photographs of Property and Horses in Jt. App. at 19-26, 33-42; photographs of water in Jt. App. at 54-56.

Based on the July 12 inspection, McCaskey applied for a search warrant. McCaskey submitted her affidavit and a letter by Dr. Houlding in support of the warrant. McCaskey's affidavit recounted the facts stated above, and added the following statement regarding her observations on the July 12th visit:

> At least 6-8 horses are in eminent danger, and 10-12 more need supportive care to save them from strangles . . . . All of the horses there are at risk, but the older, larger horses who seem to consume most of the hay, seem to be fairing [*sic*] much better than the smaller horses, lactating mares, colts and otherwise sickly ones. Removing 2/3 of the herd for supportive care seems to be needed to prevent certain death in many of them.

McCaskey Aff. No. 2 at 65.

Referring to the entire herd of horses, Dr. Houlding's letter in support of the warrant stated that "[t]hese animals are showing definite signs of neglect and some appear to be abusively neglected." Houlding Letter dated July 12, 2001 ("Houlding Letter") in Jt. App. at 53. She described a "rampant outbreak" of strangles (a deadly

and highly contagious respiratory disease in horses), and noted the herd received no treatment for the disease. *Id.* Houlding identified eight of the horses as "in imminent need of intervention" due to severe starvation. *Id.* She also described a general lack of food; several horses having injuries warranting medical attention, including one with a serious hock (i.e., lower hind leg) injury; insufficient water; and dangerous barnyard conditions. Houlding opined that the entire herd was generally neglected due to "inadequate care, inadequate feed, improper disease control, ignorance of feeding and nutrition practices . . . ." *Id.* at 68. Houlding recommended "all the animals should be removed until proper arrangements can be made for their care or sale." *Id.*

Snider echoed McCaskey and Dr. Houlding. She opined that "all of the horses were being deprived of care consistent with customary animal husbandry practices, and deprived of necessary sustenance." Snider Aff. at 2.

By July 14, 2001, a search warrant was issued based on Dr. Houlding's letter and McCaskey's affidavit. *See* Application for Search Warrant, Search Warrant, and Attachments in Jt. App. at 58-68. The warrant stated that:

> Proof has been made before me [the magistrate], as provided by law, on this day that . . . a number of horses that are sick and in immediate need of critical care. [*sic*] These horses are either exhibiting signs of a disease known as the "strangles", [*sic*] a strep infection contagious among horses[,] or are weak and malnourished.

*Id.* at 60. Accordingly, the warrant authorized any state peace officer:

> [T]o make immediate search of . . . the grounds of the acreage including any of the outbuildings and garage . . . to locate and seize any horses found on the property in the above described condition. To search the grounds, outbuildings and house . . . to determine if there are other horses, fowl or exotic birds in distress or dying.

-4-

*Id.* at 60-61.

On July 15, 2001, the Defendants, Dr. Houlding, Nicole Snider, and Deputy Sheriffs arrived at McClendon's property to execute the search warrant. Two unfortunate surprises awaited them. First, two horses had died. Their bloating carcasses were not separated from the herd. One carcass was tossed in a manure pile, its legs protruding stiffly out of the mound. The other carcass was not covered and its head was conspicuously afflicted with multiple oozing abscesses (the mark of strangles). *See* Photographs of Carcasses in Jt. App. at 69-72. Second, McClendon admitted she removed some of the most infirm horses from the herd, not in an attempt to obtain medical care for them or provide better nourishment, but solely to thwart them from being seized. *See* Order at 7. She refused to reveal the horses' location.

On the scene, Nicole Snider "observed that the condition of the horses had not improved" since her last visit to the property one month ago. Snider Aff. at 3. She opined that "all of the horses . . . were carriers of strangles," and that rescue of all the horses "was necessary to prevent further neglect." *Id.* Dr. Houlding concurred. She "recommended to Story County Animal Control that 23 horses [the entirety of the remaining herd] be rescued from the premises," Houlding Aff. at 3, because all "[t]wenty-three horses were identified as being deprived of care consistent with customary animal husbandry practices, and deprived of necessary sustenance." *See id.*; Order at 7. The Officers proceeded to seize "[t]wenty-three horses . . . pursuant to the advice of . . . Dr. Kim D. Houlding, D.V.M." Rogers Aff. at 4; McCaskey Aff. No. 1 at 5.[1]

---

[1]Iowa Code § 717.2A required consultation with a licensed veterinarian prior to seizure.

Thereafter, McClendon filed this lawsuit pursuant to 42 U.S.C. § 1983. She conceded the search warrant was valid, but argued that Defendants exceeded the scope of the warrant because all twenty-three horses were not sick with strangles, weak, or malnourished. Defendants asserted, *inter alia*, they were entitled to qualified immunity from suit.

Both parties brought motions for summary judgment before the district court. The court denied Plaintiff's motion in its entirety and granted Defendants' motion as to everyone except McCaskey and Rogers, the only Animal Control Officers. Performing a two-step qualified immunity analysis pursuant to *Saucier v. Katz*, 533 U.S. 194 (2001), the court first held a fact-finder could conclude that Defendants patently exceeded the scope of the warrant because evidence suggested that the Defendants' *motive* for seizing all the horses was to punish McClendon for removing some of the horses prior to seizure. *See* Order at 20-21. Second, the court found a genuine issue as to whether McCaskey's and Rogers' conduct violated a clearly established constitutional right because they knew or should have known that all twenty-three horses did not fit the description in the search warrant. *See id*. at 31-32.

## II. Qualified Immunity

This court reviews a denial of qualified immunity de novo. *See Tuggle v. Mangan*, 348 F.3d 714, 719 (8th Cir. 2003). Qualified immunity is a question of law not a question of fact. The threshold issue in a qualified immunity analysis is whether the facts viewed in a light most favorable to plaintiff[2] show that the state actor's conduct violated a federal constitutional or statutory right. *See id.* at 720 (*citing*

---

[2]Because this claim is premised on a Fourth Amendment violation, the court is equally obligated to adjudicate the facts from an "on-scene perspective," taking into consideration everything that the Defendant Officers knew at the time of the search and seizure, then evaluating the constitutionality of the Defendants' conduct from the perspective of a reasonable officer. *See Saucier*, 533 U.S. at 202, 205.

*Saucier*, 533 U.S. at 201).  In the context of a Fourth Amendment case alleging an unreasonable seizure, the initial analysis simply entails (1) an examination of the text of the warrant, (2) an examination of the defendants' conduct, and (3) a determination as to whether that conduct exceeded the terms of the warrant.

If the initial analysis results in a conclusion that the official's conduct indeed exceeded the warrant, then the second step is to ask whether the (violated) right was "clearly established."  *Tuggle*, 348 F.3d at 720 (*citing Saucier*, 533 U.S. at 201).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable* officer that his [or her] conduct was *unlawful* in the situation . . . confronted."[3]  *Saucier*, 533 U.S. at 202 (emphasis added).  Conduct does not violate a clearly established right unless it is "plainly incompetent" or a knowing violation of a clearly established precedent. *Saucier*, 533 U.S. at 202; *id*. at 205 ("[R]easonable mistakes can be made as to the legal constraints on particular police conduct. . . .  If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense."); *see also Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000).

### III.  Violation of A Constitutional Right

An officer's subjective intent is irrelevant to the question of whether her or his conduct violated a constitutional right by exceeding the scope of a warrant.  Indeed, an officer's subjective intent is never relevant under a Fourth Amendment analysis, so long as an objective basis for the seizure exists.  *See Saucier*, 533 U.S. at 210

___

[3]Defendants argue that the district court denied qualified immunity to McCaskey and Rogers because it applied the wrong test.  They claim the correct test is whether "a reasonable officer, identically situated, could have believed the conduct was *lawful*."  Brief for Appellants at 8.1 (*citing Saucier*, 533 U.S. at 210).  Defendants' proposed standard does not match the majority's holding in *Saucier* (quoted above).

(emphasizing that underlying intent or motive are not relevant to the inquiry; rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.") (J. Ginsburg, concurring and *citing Graham v. Connor*, 490 U.S. 386, 397 (1989)).[4]  Yet, the district court found a genuine issue as to whether a constitutional violation occurred based ***solely*** on the Defendants' possible subjective intent.  *See* Order at 20.  Even if we assume, *arguendo*, that McCaskey and Rogers seized the entire herd solely to punish McClendon for attempting to thwart the seizure, this cannot negate the uncontested fact that two professionals, Dr. Houlding and Nicole Snider, recommended removal

---

[4]This has long been the standard, for instance, in Fourth Amendment search cases wherein defendants claimed that an officer's "Terry" stop or protective search was motivated by pretext.  As this circuit has held:

> The ultimate test [of whether a protective pat-down search is supported by reasonable suspicion] is not what the searching officer actually believed but what a hypothetical officer in exactly the same circumstances reasonably could have believed.  The Supreme Court in *Whren v. United States*, 517 U.S. 806 . . . (1996), for example, ruled that an officer's "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id*. at 813.  *Whren* and other Supreme Court cases . . . stand for the proposition that under Fourth Amendment analysis it is of no consequence "that the motivation for the search did not coincide with the legal justification" for the search. *Scott v. United States*, 436 U.S. 128, 138 . . . (1978); *cf. Graham v. Connor*, 490 U.S. 386, 397 . . . (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . .") . . .  These cases thus foreclose [the] argument . . . that an otherwise-justified search and seizure violates the Fourth Amendment because the legal justification . . . was simply a pretext for law-enforcement officers to investigate their hunches . . . .

*United States v. Roggeman*, 279 F.3d 573, 581 n.5 (8th Cir. 2002) (some internal citations omitted).

of all the horses. On this basis alone, the decision of the district court warrants reversal.

We also hold that the Defendants did not violate McClendon's constitutional rights because the horses seized fit the description in the warrant. Adjudication of whether items seized fit within the warrant's description "ultimately turns on the substance of the items seized 'and not the label assigned to it by [McClendon].'" *United States v. Hill*, 19 F.3d 984, 988 (5th Cir. 1994) (*citing United States v. Word*, 806 F.2d 658, 661 (6th Cir. 1986); *see also United Sates v. Reyes*, 798 F.2d 380, 383 (10th Cir. 1986) (stating that seizure of a specific item characteristic of a generic class mentioned in the warrant is acceptable). Here, the warrant authorized seizure of "any horses," Warrant at 61, that were "sick and in immediate need of critical care," *id.* at 60, but it defined horses in "immediate need of critical care" by designating them as "horses [that] are either exhibiting signs of a disease known as the 'strangles', [*sic*] . . . *or* are weak and malnourished." *Id.* (emphasis added). As the district court noted, "[t]he description in the warrant track[ed] the descriptions as set forth in the supporting affidavits," which meant that "the execution of the warrant called for a subjective determination as to which animals fit the description." Order at 19.

Because the warrant did not identify exactly how many horses should be seized, but instead described the horses to be seized using disease, wellness, and body condition criteria, it was imminently reasonable for the Officers to rely upon the professional opinions of Dr. Houlding and Snider in determining which horses to seize. According to their opinions, the warrant description applied to the entirety of the seized herd. In Dr. Houlding's letter supporting the warrant application, she opined that the entire herd suffered from "inadequate care, inadequate feed, [and] improper disease control . . . ." Houlding Letter at 68. She recommended that "*all the animals should be removed* until proper arrangements can be made for their care or sale." *Id.* (emphasis added); *see also* Houlding Aff. at 3 (describing herd as "deprived of necessary sustenance"). Snider also opined "*all* of the horses were being

. . . deprived of necessary sustenance," Snider Aff. at 2 (emphasis added), and that "*all* of the horses . . . were carriers of strangles." *Id.* at 3 (emphasis added). The statement that an animal suffers from "inadequate feed" or is "deprived of necessary sustenance" is sufficient to qualify as a "malnourished" animal. McClendon cannot legitimately challenge the Defendants' decision to seize all the horses because the descriptive label used in the warrant was not identical to that used by Dr. Houlding or McCaskey and Rogers. *See Hill*, 19 F.3d at 988.

These statements establish a clear nexus between the horses seized and the warrant description, yet McClendon fails to address them. Instead, she construes the warrant narrowly, arguing that the warrant's express terms and the substance of the two attachments to the warrant (i.e., Dr. Houlding's letter and McCaskey's affidavit), focus *only* upon a removal of *some* horses, not all of them, and that this construction is clear. We disagree. That construction contradicts the plain language of the warrant and its supporting attachments. The warrant authorized seizure of "any horses" fitting the description and never quantified the horses to be seized. Although McCaskey's affidavit and Dr. Houlding's letter both quantified the number of horses that would clearly die without immediate intervention, they did not stop there. They ultimately recommended seizure of the entire herd. Second, officers executing a search warrant are "not obliged to interpret it narrowly." *See United States v. Stiver*, 9 F.3d 298, 302 (3d Cir. 1993) (*citing Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992)). The concept of a "narrow construction" is a convention of legal jurisprudence and would be an unworkable demand to place upon law enforcement and the experts with whom they consult.

McClendon claims that since she removed the most infirm horses, it is obvious that the remaining horses were healthy and that Defendants exceeded the scope of the warrant for the purpose of retaliating against her. We strongly disagree. At the scene of the seizure, Dr. Houlding, Snider, McCaskey, and Rogers never stated that the remaining horses were healthy or otherwise beyond the scope of the warrant. Indeed,

two horses had just died.  The district court relied heavily on transcripts from an Iowa state court disposition of McClendon's livestock purportedly documenting McCaskey's admission that she knew – at the time of the seizure – some of the horses failed to fit the warrant description.[5]  *See* Order at 31-32 & n. 19; Partial Tr. of Proceedings in the Iowa Dist. Ct. for Story County ("S.C. Tr.").  But the transcript does not actually support such an admission.  At the proceeding, Plaintiff's counsel interrogated McCaskey and *counsel* claimed that several horses were *not* exhibiting signs of malnutrition or strangles, then asked McCaskey, "[I]sn't that correct?"  S.C. Tr. at 76.  McCaskey did not concede this ground.  She maintained her belief that several of the horses were exhibiting signs of illness.  She explained, however, that she did not personally examine all of the horses for signs of illness because "[w]e were trying to do several things at the same time."  *Id.*  McCaskey also stated, "I wouldn't call any of the horses in good condition. . . . I'm not a vet.  I would say they were all thin, but they were probably not all malnutritioned [*sic*] horses."  *Id.*

We hold, as a matter of law, this testimony does not constitute an admission that McCaskey knew on-scene that some of the horses seized did not fit within the warrant's description.  First, the warrant did not require all horses seized to be malnourished.  Second, even if there was some discrepancy between the Officers' and their experts' opinion on the body condition of some of the horses, it was reasonable to rely on the experts' recommendation.  After all, McCaskey's and Rogers' "first impressions were that the entire herd was malnourished."  McCaskey Aff. No. 2 at 64; Rogers Aff. at 3.  McCaskey's testimony regarding her lay opinion of the horses' body conditions, offered *ex post* and punctuated by disclaimer, does not evidence violation of a constitutional right.

---

[5]Although the district court raised this point in step two of its *Saucier* analysis, we address the evidence here since its substance actually related to step one of the *Saucier* analysis.

One must also note that McClendon's preemptive removal of twelve horses complicated the seizure process because the Officers and others could not verify which of the thirty-seven previously examined horses were missing or their condition. The district court acknowledged the complications brought on by McClendon's preemptive removal as it discussed other Defendants involved in the seizure.

> The Court finds it was objectively reasonable for Upchurch and Atkinson [two sheriff's deputies] to believe all the horses should be seized. The duties of sheriff's deputies typically do not require knowledge of equine health; therefore, reliance on the expertise of a licensed veterinarian to determine which animals fit the description set forth in the search warrant was objectively reasonable. McClendon obscured the identification of which animals were subject to seizure by removing twelve of them in anticipation of the seizure. Since McClendon would not divulge which animals had been removed or their current location, the deputies' reliance on Dr. Houlding's determination was all the more reasonable.

Order at 27.

The district court did not extend this reasoning to McCaskey and Rogers. Because they were Animal Control Officers, the court apparently assumed that McCaskey and Rogers knew a great deal about equine health, and therefore were less justified in relying on Dr. Houlding's expertise as compared to the other Defendants. *See* Order at 31. There was absolutely no basis for assuming that McCaskey and Rogers possessed expertise on equine health. The record reveals that both Officers own horses, but this makes them no more of a veterinary expert than the average dog owner. *See* S.C. Tr. at 4, 9, 15. Even if McCaskey and Rogers did possess a lot of knowledge, there was no legal basis for holding them to a higher legal standard than the other Defendants. Clearly the best course of action was to rely on the professional recommendation of a third party licensed veterinarian on the scene, not their own personal impressions, which could obviously be attacked at a subsequent hearing as

lacking veterinary expertise. Moreover, Iowa Code § 717.2A required consultation with a licensed veterinarian prior to rescuing neglected livestock. We will not bar McCaskey and Rogers from the benefits of qualified immunity because they followed the law of their jurisdiction and obtained a veterinarian's opinion, as any reasonable Animal Control Officer would. The district court's finding that the deputies' reliance on Dr. Houlding's expertise was "all the more reasonable" in light of McClendon's efforts to thwart the seizure, *see* Order at 27, was equally applicable to McCaskey and Rogers.

In light of the above, McClendon's constitutional rights were not violated and the qualified immunity inquiry ends here. The judgment of the district court is REVERSED as to McCaskey and Rogers and AFFIRMED as to the dismissal of all other Defendants.

MELLOY, Circuit Judge, concurring and dissenting.

I respectfully dissent because I believe the district court properly denied qualified immunity to officers McCaskey and Rogers. I concur in the majority's affirmance of the dismissal of the remaining defendants.

As stated by the majority, we undergo a two-step process when we review a denial of qualified immunity. At the outset, we determine whether the facts as asserted by the plaintiff "show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). If the answer is no, that ends the inquiry. If the answer is yes, we go on to determine "whether the right was clearly established." Id. The test for deciding whether a right was clearly established is "whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." Id. at 202. "This inquiry must be undertaken in the 'proper sequence.'" Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) (quoting Saucier, 533 U.S. at 200).

-13-

An appeal of a denial of qualified immunity does not concern "the correctness of the plaintiff's version of the facts, nor even . . . whether the plaintiff's allegations actually state a claim." Mitchell v. Forsyth, 472 U.S. 511, 528 (1985). Our analysis is limited to "a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." Id.; see also Behrens v. Pelletier, 516 U.S. 299, 306 (1996); Johnson v. Jones, 515 U.S. 304, 311 (1995); Nebraska Beef v. Greening, 398 F.3d 1080, 1082-83 (8th Cir. 2005) (discussing the jurisdictional limits prescribed in Mitchell, Johnson, and Behrens).

Thus, our task is to ask, first, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Saucier, 533 U.S. at 201. I believe McClendon clears this first hurdle easily. McClendon alleges that officers intentionally exceeded the scope of the warrant by seizing healthy horses. If this allegation is true, then the officers' conduct violated McClendon's constitutional rights. Audio Odyssey, Ltd. v. Brenton First Nat. Bank, 245 F.3d 721, 736 (8th Cir. 2001) ("A seizure of property that is unsupported by a warrant or other court order is presumptively unreasonable within the meaning of the Fourth Amendment."). Assuming McClendon's version of the facts is correct, as we must, she has "show[n] the officer's conduct violated a constitutional right," Saucier, 533 U.S. at 201, and we move on to the second part of the inquiry.

At one point, the majority appears to recognize the initial inquiry is limited in this way. (Majority Opinion at 7 ("In the context of a Fourth Amendment case alleging an unreasonable seizure, the initial analysis simply entails (1) an examination of the text of the warrant, (2) an examination of the Defendants' conduct, and (3) a determination as to whether that conduct exceeded the terms of the warrant.").) However, the opinion goes on to discuss at length whether the horses were in fact outside the scope of the warrant, various statements made about the horses at various times, and the likely levels of knowledge the individuals involved had about equine

-14-

health. In my view, much of the analysis done by the majority is inappropriate under the first prong of the qualified immunity analysis, which is confined to determining whether a constitutional violation could be shown if all the facts, as presented by the plaintiff, are true.

Our second task is to determine whether a reasonable officer would know the seizure of the horses was unlawful, "in light of clearly established law and the information the searching officers possessed." Anderson v. Creighton, 483 U.S. 635, 641 (1987). At the summary judgment stage, the burden of proof is on the moving party, so the party seeking immunity must establish the relevant predicate facts. Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000). "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001); accord McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 2005 WL 497180, *2 (8th Cir. 2005). "In the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." Pace, 201 F.3d at 1056.

"[P]ublic officials are permitted to claim on appeal that their actions were objectively reasonable in light of their knowledge at the time of the incident." Mueller v. Tinkham, 162 F.3d 999, 1002 (8th Cir. 1998); see also Lyles v. City of Barling, 181 F.3d 914, 917 (8th Cir. 1999) ("A law enforcement officer is entitled to qualified immunity from suit for actions that are objectively reasonable in light of clearly established law and the facts known by the officer at the time of his [or her] actions."). "[W]e will affirm the denial of a qualified immunity claim if there exists a genuine issue of material fact concerning the officers' knowledge or if the moving party is not entitled to judgment as a matter of law." Lyles, 181 F.3d at 917; accord Vaughn v. Ruoff, 253 F.3d 1124, 1127 (8th Cir. 2001). Thus, though we assess the reasonableness of the officers' actions from an objective standpoint, we do so taking

-15-

into account the "specific context of the case," including the officers' knowledge. Saucier, 533 U.S. at 201.

I believe that, in this case, there is an issue of material fact as to the predicate facts surrounding qualified immunity, namely, what the officers on the scene knew when seizing the horses. It is undisputed that a veterinarian on the scene recommended removal of all the horses. (Affidavit of Dr. Kim D. Houlding, DVM, at Jt. App. 17 ("Twenty-three horses were identified as being deprived of care consistent with customary animal husbandry practices, and deprived of necessary sustenance. Accordingly, I recommended to Story County Animal Control that 23 horses be rescued from the premises.").) The majority states that this fact alone dictates the officers are entitled to qualified immunity. I respectfully disagree because the details of the exchange are unknown.

The search warrant allowed for removal of horses that were "sick and in immediate need of critical care." (Search warrant, Jt. App. 60) The warrant described these horses as "either exhibiting signs of a disease known as the "strangles" . . . or . . . weak and malnourished." Id. So, for a horse to be legally seized, it needed to be (1) "sick and in *immediate* need of *critical* care" and (2) either (a) exhibiting signs of the "strangles" or (b) weak *and* malnourished. Id. (emphasis added). If the defendants had shown Dr. Houlding had stated that all the horses were weak, malnourished, and in immediate need of critical care, or alternatively that all the horses were showing signs of the strangles and were sick and in immediate need of critical care, and therefore that they should be seized, I would join in the majority's grant of qualified immunity. Under those circumstances, I agree with the majority that "it was imminently reasonable for the Officers to rely upon the professional opinion[] of Dr. Houlding . . . in determining which horses to seize." (Majority Opinion at 9.) Under such circumstances, it would not be clear to a reasonable officer that his or her behavior was unlawful, even if some of the seized horses were healthy, and the officer would be entitled to qualified immunity.

-16-

However, the defendants have not made that showing in this case. Instead, we have a statement from Dr. Houlding that the horses "were identified" (the passive voice making it unclear whether she was the one doing the identification) "as being deprived of care consistent with customary animal husbandry practices, and deprived of necessary sustenance." It was for this reason that Dr. Houlding recommended their removal, according to her statement. Even assuming that Dr. Houlding and not some other individual identified the horses as such, her description of the horses during execution of the warrant does not match the description in the warrant. It is possible that Dr. Houlding knew the scope of the warrant and told the officers on the scene that the horses all fit the terms of the warrant, but this is not shown by the evidence before us. Instead, the evidence shows that the veterinarian on the scene found the horses were deprived of "necessary substenance" and "care consistent with customary animal husbandry practices." In my view, this observation is not close enough to the terms of the warrant for the officers to reasonably rely on it in seizing all the horses. I agree with the majority that the officers could reasonably rely on a recommendation that did not match the warrant language verbatim. However, this is not a case in which the expert used slightly different terms but in essence made the observation required for seizure. This is a case in which the veterinarian found a sub-standard quality of care and not enough food available, when the warrant required the horses be (1) sick and in *immediate need of critical care* and (2) either (a) showing signs of the strangles or (b) weak *and* malnourished.[6]

---

[6]As support for its finding that all the horses were properly seized, the majority offers the statement of Dr. Houlding that "all the animals should be removed until proper arrangements can be made for their care or sale." (Majority Opinion at 9-10.) I would find that this statement is of no help to the defendants' case because this statement appears in a letter written by Dr. Houlding and attached to the warrant application. The court that drafted the description of the horses to be seized had Dr. Houlding's recommendation before it, and it chose not to simply empower the officers to rescue all of the horses, but instead only to rescue horses in a particular condition. This shows that Dr. Houlding had the opinion that all horses should be seized even before the warrant was issued and before its terms were set, not that she

-17-

Thus, I believe there is a question of material fact as to what the officers knew on the scene, that is, what Dr. Houlding told them about the horses and how this matched up with the terms of the warrant. Adding to the uncertainty are facts that suggest that the officers knew the horses were healthy, but seized them anyway, perhaps because McClendon had moved some of her horses before their arrival.[7] McCaskey testified that they "loaded them up because we didn't want any more animals disappearing." (McCaskey testimony, First Supp. Jt. App. at p. 217.) She also testified that "for the protection of the horses *and because the others had been moved*, we removed them." (McCaskey testimony, Jt. App. at 144 (emphasis added).) In addition, the video footage submitted shows an exchange between McClendon and one of the officers during the execution of the search warrant. McClendon says that the Notice stated that only the sick horses would be seized and the officer replies, "We were going to take the ones showing signs of disease, but the ones showing the greatest signs of disease have disappeared."

As stated above, "we will affirm the denial of a qualified immunity claim if there exists a genuine issue of material fact concerning the officers' knowledge." Lyles, 181 F.3d at 917. I believe these facts, taken in the light most favorable to McClendon, are sufficient to leave a genuine issue of material fact as to the knowledge the officers had on the scene. This precludes a finding of summary judgment at this stage.

---

believed they all fit the terms of the warrant.

[7]This fact dispute also raises the issue of willfulness. We note that willful violations of law are not subject to qualified immunity protection. "Qualified immunity protects 'all but the plainly incompetent *or those who knowingly violate the law*.'" Saucier, 533 U.S. at 202 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)) (emphasis added).

I would affirm the district court's denial of qualified immunity as to McCaskey and Rogers. I would also affirm the dismissal of the other defendants.

_____